[Civ. No. 1876.   Third Appellate District.—October 14, 1918.]

## FRANK N. McCOLLUM, Respondent, v. J. H. BARR, Appellant.

PHYSICIANS AND SURGEONS — MALPRACTICE — ERRONEOUS DIAGNOSIS — FAILURE TO USE ORDINARY SKILL AND CARE—SUFFICIENCY OF EVIDENCE.—In this action for damages resulting from defendant's alleged unskillful treatment as a physician and surgeon of an injury to plaintiff's arm, it is held that the verdict is supported by the evidence, which shows that the defendant made a faulty and erroneous diagnosis of the injury, and adhered to it during the period of his treatment, and that such error could have been avoided by the exercise of ordinary care and skill.

ID.—IMPEACHING WITNESS—OBJECTION PROPERLY SUSTAINED.—A physician who was a witness for the plaintiff, having testified that he had examined the plaintiff while still under defendant's care, and discovered at once by visual and digital examination that his forearm was fractured, and had confirmed this by the X-ray, that the usual and recognized method of examination among the profession of such injuries as that in question, for the purpose of diagnosis, is by the X-ray, and the failure to use it would not be the exercise of ordinary skill and care, although he had treated patients with dislocated and fractured forearms without examination by the X-ray, and that in case of pure dislocation the X-ray was not essential, an objection to an offer by the defendant to show by a patient of the witness, for the purpose of discrediting his testimony, that he had treated this patient without resort to the X-ray, was properly sustained.

ID.—MISCONDUCT OF COUNSEL—REPEATING QUESTIONS ALREADY RULED OUT.—It was improper for plaintiff's attorney to repeat in another form questions already ruled out by the court and thus endeavor to get before the jury in another form the matter ruled out, but the matter having been stricken out and the court having instructed the jury to pay no attention to it, an appellate court must assume that the jury obeyed the court's instructions.

ID.—REQUESTED INSTRUCTION.—The court, having at the request of the defendant, instructed the jury that the burden rested upon the plaintiff to prove certain material allegations of the complaint, the omission to tell the jury in that instruction that the plaintiff must prove his allegations "by a preponderance of the evidence" was not of sufficient importance to justify a reversal.

APPEAL from a judgment of the Superior Court of Sutter County.   K. S. Mahon, Judge.

The facts are stated in the opinion of the court.

J. E. Ebert and W. H. Carlin, for Appellant.

Edgar C. Levey, George M. Lipman, and W. P. Rich, for Respondent.

CHIPMAN, P. J.—This is an action for damages resulting from defendant's alleged unskillful treatment as physician and surgeon of an injury to plaintiff's right forearm.

It is alleged in plaintiff's second amended complaint that, on October 24, 1915, he fractured and broke his right forearm in cranking an automobile, and upon that day he called upon defendant and informed him thereof, and employed defendant as a physician and surgeon "to examine such fractured and broken forearm and ascertain the extent of the injury thereby caused and to set the same, if broken, and to treat and heal the same for whatever the injury was to it." It is further alleged as follows: "That defendant thereupon, as a physician and surgeon and pursuant to such employment and undertaking had a reasonable opportunity for examining and did examine the injured forearm of plaintiff; that by the exercise of ordinary skill in making said examination the defendant could have discovered that said plaintiff's forearm was fractured and broken, but defendant examined plaintiff's forearm in a negligent and careless manner, and without exercising ordinary skill and by reason thereof defendant failed to ascertain that plaintiff's forearm was fractured and broken, and he, the said defendant, treated and tried to heal plaintiff's injured forearm, as though the same was not fractured and broken, greatly to plaintiff's injury."

In his answer defendant alleges that plaintiff came to him for treatment as alleged in the complaint "with the wrist joint of his right arm completely dislocated backward; but defendant denies that his right forearm was broken or fractured"; that "defendant then and there examined said forearm and used all due diligence and care to ascertain the extent of the injury thereby caused, and he did treat the same and continued such treatment at intervals whenever called upon by plaintiff until on or about the eleventh day of December, 1915. That up to said time defendant discovered no fracture in plaintiff's said forearm, nor had plaintiff

complained of or mentioned any such fracture until said eleventh day of December, 1915; that on said date, however, plaintiff did ask defendant if he thought his said forearm was in fact fractured, and thereupon defendant stated to him that he had as yet discovered no fracture, but that he could and would make further examination of said forearm by applying thereto the X-ray process. Thereupon plaintiff left the office of defendant and failed to return for further treatment or at all.'' Defendant denies the averments of the complaint set forth in the fourth paragraph, and, on information, alleges: ''That plaintiff's forearm was not in fact fractured or if fractured the fracture was not of such a nature or character that with the exercise of ordinary care and skill on the part of defendant he was unable to discover the same.''

The cause was tried by the court with a jury and plaintiff had the verdict for the sum of one thousand dollars, and judgment followed accordingly for plaintiff. Defendant appeals from the judgment.

Plaintiff testified that he was cranking his automobile in Yuba City, ''shoving down hard, and it back fired, throwed my arm back in this condition, it made a big lump up here and a lump underneath here, and after that I immediately got a horse and buggy and came to Dr. Barr's residence,'' where he met Dr. Barr in Yuba City. He was asked to describe the condition and general appearance of his arm when he called upon Dr. Barr and answered: ''Well, my arm— there was a large lump underneath here and a hump on the top and the bones were spread out here and inclined down a little bit''; he stated that his hand ''was kind of back a little bit; . . . my hand was black and blue and up to my elbow here.'' He was asked to state what Dr. Barr did and said at this time: ''The doctor examined my arm, pressing in here in this manner and on the side for about a minute and told me to come out to his automobile and he would examine it further. I went out to his automobile there and he asked Mr. Beaver— Q. Who is Mr. Beaver? A. He is a brother-in-law of mine—to hold his arm on my shoulder, he would pull on it in this position, worked my arm up and down like this a little bit, still continuing to press on it, and asked Mr. Beaver to hold my arm in this position while the doctor wrapped it with the bandage, merely wrapped it, then helped me on with my coat, stuck my hand through the bib of my

overalls and told me I would be all right in a few weeks. Q. Did you have any further conversation at that time? A. That was all at that time, but later in the day I met him at the Rideout Hospital, my arm was paining me very severe, we got in his automobile and rode up to the cold storage place and he waited on Mr. Heilman's daughter, I believe— Mr. Carlin: Unless the witness was along we object to it as hearsay. Mr. Levey: Q. Did you ride with him? A. I rode in the front seat of the automobile with the doctor. We went from the Rideout Hospital to the cold storage and from there to the doctor's office and after visiting his office he took my arm, nipped the bandage off with a pair of scissors, pressed on it again in this manner, not over a minute, then laid my arm in one of these metal splints in this condition with the hand turned in, wrapped it with a bandage, and I had a sling around my neck at the time; after wrapping the bandage about here to here, he laid it in the sling, and said I would be all right in a few weeks. Q. How many splints did he use? A. Just the one.'' He testified that the splint extended from the wrist to a point near the elbow. ''Q. Did Dr. Barr say anything or not at this time as to what was the nature of the injury? A. He merely stated it was a dislocated arm.'' He testified that he continued his visits to Dr. Barr for treatment from October 24, 1915, to December 11, 1915, visiting him about three times a week. He was asked what Dr. Barr did at these visits: ''A. Every time I would visit Dr. Barr he would merely take his scissors, rip the bandage off and feel my arm, in this position, lay the splint back and wrap it up, that is all he ever done. Q. Did you and Dr. Barr have any conversation during any of these visits with relation to the condition of your arm or the cause of the injury? A. Yes, sir; I asked Dr. Barr what made that large lump in my arm there; he stated that the tendon was out of place and that pulled my hand back in that position; he showed me a skeleton hanging up in the corner and explained to me where this tendon was out of a little groove that passed over that bone; he says that is what pulled that cord back, he says, 'I will never be able to get that back in place any more.' Q. Did Dr. Barr use any other method of examination during the course of your treatment with him other than what you have testified to? A. None whatever. . . . Q. During this time what was the condition of your arm?

A. I couldn't use my arm for any purpose whatever; I was
unable even to hold a lead pencil in my hand to write with a
lead pencil, no motion whatever, or only a little bit.   Q. What
was the general outward appearance of the arm at the end
of the seven weeks?   A. Crooked in this condition, a large
lump here, one underneath, and these bones spread apart.''
He testified that at the end of seven weeks, on December 10,
1915, he consulted Dr. Kauffman, who examined his arm
through a fluoroscope and then told him to go back to Dr.
Barr, but plaintiff was not permitted to testify what Dr.
Kauffman said of the nature of the injury.   ''Q. Did you
go back to Dr. Barr?   A. Yes, sir; I went back to Dr. Barr
and I asked Dr. Barr if my arm was broke, and he stated
no, it was merely dislocated, be all right in three or four
weeks, could go to work.   I asked him the question the
second time, 'Is my arm broke?' and he stated, 'No, it was
not.'   Q. Did he say anything further at this time?   A. No,
sir; none whatever.   Q. Then what did you do, if anything?
A. I went back to Dr. Kauffman; he examined my arm the
second time and told me to go to San Francisco.''   He tes-
tified that he went to San Francisco and consulted Dr. Hun-
kin, who took an X-ray picture of the arm, and from there
he went to the Fairmont Hospital in San Francisco, where
he received treatment under Dr. Hunkin's direction for ten
days and remained at San Francisco under Dr. Hunkin's
treatment for thirteen weeks, after which he returned to
Marysville.   He testified that while under the care of Dr.
Barr he followed his instructions with reference to his arm
and did nothing contrary thereto; that he was incapacitated
to work from October 24, 1915, until April 3, 1916.   He was
a mill worker and plumber.

It came out on cross-examination that Dr. Kauffman told
plaintiff his wrist was broken.   This was the day before plain-
tiff made his last visit to Dr. Barr.   ''Q. So you said, 'Dr.
Barr, is my wrist broken?'   A. Yes, sir.   Q. You asked him
the second time?   A. Yes, sir.   Q. He told you he thought
not?   A. He told me it wasn't broken.   Q. And you said,
'That is all I want to know?'   A. I told him I wanted to
know if my arm was broken.   Q. Then what did you say
to him?   A. 'That is all I want to know if my arm is
broke.'   Q. Why didn't you tell him that you had the opin-
ion from another doctor or surgeon that the wrist was

broken? A. I didn't know which doctor was right." The witness stated that he did not tell defendant that he had seen another physician or what that physician had told him.

Dr. Kauffman testified that when plaintiff visited him he examined plaintiff's arm, both visually and by use of the fluoroscope, "an apparatus used in conjunction with the X-ray, coil and tube whereby one can visually see the bones or other structures without taking a plate"; that he found a fracture of both of the bones, both the radius and ulna of the right forearm, these two bones connected with the bony structure of the forearm. "Q. What condition did you find in the arm? A. Both bones broken. Q. What was the exterior appearance of the arm at the time Mr. McCollum called upon you? A. The lower end, that is, the lower end of the radius where the bone was broken, the broken piece, the detached piece of the radius, lay heaped up on top of the portion of the radius associated with the elbow joint, and on the underneath surface the distal extremity, the other end of the radius, the other end of that broken bone, was sticking out in a projection underneath. The broken piece was heaped up on top of the bone and there was a projection due to the unbroken piece projecting below it. Q. Was this visible to the naked eye? A. Yes. Q. What was the position of the styloid process, that is, the ends of each of the two bones of the arm at the time? A. The styloid process of the radius was up above the level of the remaining portion of the radius; that is to say, instead of being in line with the rest of the bone, it was sticking up about three-quarters, between three-quarters and an inch out of alignment, and the styloid process of the ulna, while not as much difference, was still distinctly out of alignment."

Dr. Hunkin testified that plaintiff consulted him and that he found that both bones of the right forearm—the radius and ulna—were broken, with some displacement; that he made an examination with the X-ray, which disclosed both bones broken; that plaintiff came to him December 15, 1915, and that he "saw him up to March 25, 1916; that plaintiff was taken to the Fairmont Hospital, where he was operated upon. "Q. Will you state what you did and what course was followed in making the first examination when Mr. McCollum first called upon you? A. I examined him with my fingers and with the X-ray. Q. Will you state what the

examination of the fingers consisted of? A. I examined the arm and hand as to movement and as to the character of the power and as to the position. Q. Was any opening made at the point of fracture at the time of examination? A. No opening was made at that time. Q. Will you state just what condition you found there at the time of the operation and will you state exactly what was done? A. The bones were lifted in place and secured in proper position. Q. What condition did you find with respect to the bones? A. I found the lower fragments displaced backwards and impacted. Q. From your examination, both at the time of the first calling and at the time of the operation, can you say of how long standing this fracture was? A. I cannot. . . . Q. From your examination and the condition presented at the time of the operation, can you say whether or not there was any dislocation of the wrist between the radius and the small bones of the wrist? A. No, there was no dislocation. Q. Did you find any dislocation in the arm in the course of your examination or at the time of the operation? A. Technically, I would have to answer no. Q. Did you or did you not find a dislocation in the course of your examination in this case? A. No, I have had many cases of like fractures, but every case is different. There was no dislocation, there was some displacement of the end of the fractured bones; displacement is not dislocation. Dislocation is where the bone is out of place with its mate, if you understand. Displacement is where the bones are broken and out of place somewhere else. . . . Q. Will you state what the displacement consisted of and what was the result? A. The lower fragments were displaced backwards. . . . Q. In your examination, upon what did you determine an operation to be necessary? A. The displacement chiefly. Q. Was an operation essential and necessary in this case or not? A. I think so. Q. At the time of the operation, was there a union between the bones? A. There was not. Q. Was there any impaction of the fragments? A. Yes. Q. Will you state just what the condition was in that respect? A. The upper fragment was jammed into the lower fragment. Q. Would you call this an ordinary fracture? A. The manipulation of the wrist between the fingers showed this to be more than an ordinary fracture. . . . Q. What was the position of the hand with respect to the arm at the time Mr. McCollum called

upon you? A. The hand was displaced backward. Q. At about what angle? A. Displacement has no relation to angle. Q. Will you state just what was the position of the hand with relation to the forearm at the time the patient called upon you? A. The lower fragment was displaced backward and impacted into the upper and the position of the hand was displaced backward.''

Defendant testified in his own behalf. He was asked to give his account of plaintiff's injury and the treatment given. He replied: ''He came to my residence on October 24, 1915, informing me that he had injured his hand by cranking an automobile and wanted me to take care of it. I looked at the hand and my bandages and case were out in the automobile; we went out there and with the assistance, I believe he said his brother-in-law, Mr. Beaver, I believe is the name—between us, Mr. Beaver holding the arm and my pulling and manipulating the wrist, I reduced a dislocation of the right wrist between the carpal and metacarpal bones. Q. To what extent did you at that time examine the forearm or wrist? A. I examined it very thoroughly at that time to see—beforehand to see what the conditions were, and after placing them to seeing that they were in place. Q. Did you at that time discover any evidence of a fracture? A. I did not. . . . Q. For what purpose was your examination made? A. For the purpose of ascertaining the extent of the injury. Q. Proceed, if you will, and detail the times when you treated him and the nature of the treatment. A. During the same day he called on me, saying that his hand was quite painful and was swelling very rapidly; I stated I would be at the Rideout Hospital in a short time and to meet me there and I had to make a call, he got in the automobile with me and I made the call; we returned to the office, I removed the bandage I had previously applied, then applied Levis' metallic splint to the hand and rebandaged it again; I also examined the hand very thoroughly at the office at that time.'' He testified that plaintiff came to him at different dates, giving them, in October and November, and, on November 3d he removed the splint from the hand and applied the bandage only. ''Q. At that time, in your opinion, what progress was being made with the forearm? A. That it was in very good shape; there was still some swelling, still some thickening; on November 29th I removed the bandage, and I last saw him on

December 11th and examined the hand. He said: 'Doctor, I cannot grasp anything.' I said, 'Take something in the hand, put it in motion and it will strengthen it, as you use the hand and put it in motion.' That is the last time I saw him to examine the hand under my care. Q. Was there anything said by him at that time or any question asked about whether his hand was broken or his arm? A. On December 11th he came to my office and asked me, saying, 'Doctor, do you think my arm is broken?' I said, 'Up to the present time I have seen nothing to indicate that your arm was broken.' " He was asked to describe what he did on October 24th when plaintiff first came to him and answered: "I took his hand in my hand, grasping the fingers firmly, Mr. Beaver taking hold of the shoulder and arm, and by giving a very vigorous pull with my hand pulling on his and with my fingers against the dislocated parts, pressing and bringing them down and working them in place, so they were placed down into their proper position. I then requested Mr. Beaver to take hold of his hand and as I had no splint at the house and I don't like to put on a piece of stave or barrel or anything of that kind, I simply bandaged the hand until I could get to the office, which was done in the afternoon. The hand was kept in the position we usually keep fractures or dislocations, which is a position with the fingers slightly extended out as in all splints if you look at them; the hand was padded and bandaged in that position and kept in that position in the splint, brought up against the body, bending the elbow, bringing it up here for easy carriage. At the time I examined the forearm there was a deformity in the wrist and the palm of the hand, and a deformity on the back of the hand by the bones projecting backward out of their place. Q. On the hand, you mean? A. And the wrist, in the wrist." He testified that the deformity referred to was caused by "a dislocation of those bones from each other"; that the "discoloration of the hand extended only about two and a half inches from the palm of the hand in the wrist." He further explained as follows: "The dislocation occurred in this location between the carpal and metacarpal bones; the metacarpal bones were driven upward and backward over the carpal bones; by traction it was pulled and worked, with the assistance of Mr. Beaver, until those bones were reduced and in place; of course, there was some swelling at that time,

but on examining the hand at the present with the exception of the scar I see here on the hand, I cannot see much if any difference in the alignment than what it was when I last saw it in my office on December 11, 1915; there was some thickening all through the hand, and by nonuse it had probably atrophied some; the hand to-day is about perhaps the same alignment that it was at that time; there is still some thickening at this place on the hand at the present, which can take place in all cases of the tearing of the ligament of any joint.'' He testified that at no time did he discover any indications of a fracture and that at all times he treated him to the best of his ability.

On cross-examination he testified that when plaintiff first came to him the discoloration was as he had stated, but later, within two or three days, ''it showed further up''; that he employed no method of examination of plaintiff's injury ''other than digital and visual,'' and did not use a fluoroscope or X-ray; that he visited patients in the Rideout hospital and that there was an X-ray apparatus there; that he treated the case as one of dislocation; that in his practice if he had a suspicion that there was a fracture he used the X-ray, but in this case he had no such suspicion.

The foregoing facts are found in the testimony of the only witnesses who saw or treated plaintiff or had personal knowledge of his injury. The remaining testimony is that of physicians who had practiced surgery given as experts. For example, the following questions propounded to Dr. Miller by defendant, and his answers, will illustrate the scope of this class of evidence relied upon by defendant: ''Q. Assume on the 24th of October, 1915, the plaintiff here was at that time 27 years of age, called upon a surgeon, the defendant in this case, stating to him that he, the plaintiff, had just that day received an injury to his right forearm or wrist by the cranking of an automobile. Will you please state to the jury what, in your opinion, ordinary care and skill would require of the surgeon in diagnosing and treating that injury? A. The first thing we do usually is to inquire how the accident happened, the direction in which the force was applied and the amount of force that was exerted, as near as can be found out; then we look at the arm or the wrist, note if there is any deformity, any swelling or discoloration, then we usually put it through certain motions, using both hands to see if there is a dis-

location or fracture, in fact to discover the extent of the injury; that is the ordinary procedure in examination of injuries of this nature. Q. And assuming that the physician or surgeon should diagnose the case as a dislocation and be called upon to treat the patient for a period of time, some weeks thereafter, state, Doctor, what, in your opinion, reasonable care and skill on his part would require in such treatment, and how it should be done? A. The first treatment consists in correcting any condition that may exist; for instance, if it is a dislocation, the dislocation is reduced; if it is a fracture, the fracture is reduced; whatever condition exists is corrected as discovered by the surgeon; for instance, a dislocation of the wrist, the parts are put back into position and the hand and arm are put in a splint and immobilized. . . . Q. Now, Doctor, in your opinion, in such a case as I have suggested to you in my first question, would ordinary care and skill on the part of the surgeon necessarily require the use of the X-ray? A. Not necessarily, no, because we treat a great many fractures and dislocations without the use of the X-ray, and it is ordinarily done.'' On cross-examination he testified that where there is doubt ''it is customary to use the X-ray.''

Dr. Gray, called by defendant, gave somewhat similar answers to like questions put to Dr. Miller. On cross-examination he testified that in case of doubt he regarded it as essential to use the X-ray; that the treatment described by him had reference to dislocations and not to fractures; that the treatment would not differ ''if the bones were properly approximated''—that is, ''if the bones had set in their proper position.''

Dr. Kauffman, called by plaintiff, testified that where an injury such as the one in question is presented to a surgeon the usual and recognized method of examination among the profession for the purpose of diagnosis is by the X-ray, and that an examination without the use of the X-ray ''would not indicate the exercise on the part of the examining surgeon of ordinary skill and care. Q. If a patient's arm, at the time of examination, reveals a deformity in the form of a prominence on the inner or front surface of the forearm, a widening of the two bones of the forearm at the wrist and a discoloration of the forearm from the wrist to a point near the elbow, would that condition indicate a fracture or

a dislocation or either, in your opinion? A. Fracture.
Q. If both bones of the forearm are broken near the wrist,
would you, in your opinion, say that the placing of the fore-
arm in the splint with the hand drawn towards the body, was
the usual or is the usual and recognized method of treatment
among the profession to secure proper results in the case of
a fracture? A. No. Q. Will you give your reasons for that
statement, Doctor? A. Because one is not getting apposition
in that way. Q. Explain what you mean by apposition.
A. Merely carrying out the procedure as indicated in the
question won't bring the two ends of each bone in position,
that is, if both bones of the forearm were broken, putting on
a splint bringing them toward the body, is doing nothing
whatever to bring these two bones and the broken ends of the
bones together; it is bringing the whole forearm against the
body, not bringing the two ends of the bone together. . . .
Q. In your opinion, where a patient calls upon a surgeon with
his arm injured in the manner indicated by me in my pre-
vious questions, would the examination and treatment of the
arm or wrist in the case of a dislocation without the use of an
X-ray plate, be in accordance with the usual method pursued
by the profession in such cases?" Over objection, the witness
answered: "No. May I explain that? Q. Give your rea-
sons; you may explain it. A. I was wondering what was
happening. One can't be sure that any dislocation is a pure
dislocation or that associated with the dislocation there is not
some concomitant fracture; in treating the dislocation with-
out treating the fracture that may go with it, you won't get
perfect results; while you may treat a case successfully of
pure dislocation without the X-ray plate, it isn't good prac-
tice. A dislocation *per se* may be treated without an X-ray
plate."

Dr. Casper, adjunct surgeon of Mount Zion hospital, San
Francisco, was called by plaintiff: "Q. If a patient who has in-
jured his right forearm in cranking an automobile calls upon
the surgeon to examine the forearm and ascertain the cause of
the injury, and if the forearm at the time reveals a deformity
near the wrist, ascertainable by observation, would the taking
of the patient's hand by the surgeon, coupled with the press-
ing of the latter's thumb upon the wrist bones of the patient's
arm, and other manipulations, the feeling with the fingers of
both bones of the arm and the pulling of the patient's arm,

be sufficient by the exercise of ordinary skill and care on the part of the surgeon, to determine the existence of a fracture and displacement and dislocation or either, if the same were present?'' Over objection, the witness answered: ''Yes, and I would say such an examination supplemented by the X-ray, either before or after. Q. In the case of an injury of this character, happening as I have stated in my previous questions, if an X-ray was not used, would you say in your opinion that that would indicate the exercise of ordinary skill or care on the part of the surgeon?'' An objection was overruled and the answer was: ''I would say it was not. Q. If the patient's arm, at the time of examination, reveals a deformity in the form of a prominence on the inner or front surface of the forearm, a widening of the two bones of the forearm at the wrist, and a discoloration of the forearm from the wrist to the elbow, would that condition indicate, if there was exercised by the surgeon ordinary care and skill in his examination, a fracture or a dislocation or either?'' Over objection, the witness answered: ''It would be very suggestive of a fracture. . . . Q. If there were a dislocation, would there, in such a case, be a discoloration of the arm from a point near the wrist to a point near the elbow? A. It is not as likely as in a fracture.'' He testified that in his opinion it was not ordinary skill and care on the part of the surgeon to treat a dislocation of an arm or wrist without using the X-ray if the latter were accessible; that if the X-ray is not accessible when the patient is first treated it should be resorted to ''as soon as the splints are applied.''

The instructions given by the court correctly and without objection stated the principles of law by which the jury were to be governed as follows:

''One who holds himself out to the world as a physician and surgeon impliedly contracts that he possesses the skill properly to practice his profession and specialty. He is bound, therefore, in the discharge of his duties, to use ordinary care, diligence, and skill, according to the circumstances of the case.

''If the defendant in this case possessed the skill and learning, which is required of one of his profession, and failed to exercise it in this case, and, in his examination and treatment of patient's injured arm, was careless and negligent and the plaintiff was injured and sustained damages in consequence

thereof, the defendant is liable for such damages as plaintiff has sustained.

"A patient is entitled to ordinarily careful and thorough examination such as the circumstances, the condition of the patient and the physician's opportunities for examination will permit. If there is a reasonable opportunity for examination and the nature of the injury or ailment can be discovered by the exercise of ordinary care and treatment, then the physician is answerable for failure to make such discovery.

"The court instructs the jury that if you find that plaintiff's forearm was fractured and displaced, and not dislocated, at the time he consulted defendant, and during the times he remained under defendant's treatment and that defendant's failure to ascertain that such forearm was fractured and displaced, and his subsequent treatment of the same for a dislocation, were the result of a failure on the part of defendant to exercise, as a surgeon, ordinary care and diligence in connection therewith, you will find, under the evidence, that plaintiff is entitled to a verdict for the amount of the damages which in your opinion he should recover in accordance with the evidence in the case.

"A surgeon does not undertake to perform a cure nor does he undertake to use the highest possible degree of skill, but he undertakes only a fair and reasonable degree of skill and the question for the jury to decide is whether in his treatment of the plaintiff defendant used such reasonable care and skill, and unless you find from the evidence that he failed in this respect plaintiff cannot recover and your verdict must be for defendant.

"In his treatment of plaintiff defendant as a physician and surgeon was not required to avail himself of the use of any particular appliance. All that was required of him was to adopt such means and follow such procedure and use such appliances as under the circumstances was required in the exercise of ordinary care and skill; and if you find from the evidence that in this regard defendant did use ordinary skill and care, then your verdict must be for defendant.

"Even if you find from the evidence that at the time plaintiff called upon defendant for treatment he was suffering both from a fracture and dislocation of the forearm, and that defendant treated him for a dislocation only, and that in so doing defendant exercised reasonable skill and care to ascer-

tain and treat the nature of plaintiff's injuries, then your verdict must be in favor of defendant.''

In point of numbers the expert witnesses called by defendant and testifying substantially as did Dr. Miller and Dr. Gray exceed the number testifying as experts at plaintiff's call. It will be observed, however, that the attention of defendant's expert witnesses was directed more particularly to a case where the attending surgeon's diagnosis and treatment had relation to a case of dislocation, whereas the two expert witnesses called by plaintiff were given a statement of what was claimed to be the facts in the present case as shown by the evidence. Appellant's contention is that he made an honest diagnosis upon sufficient examination according to accredited practice in such cases, and did all he could in subsequent treatment, and all that ordinary care and skill required to accomplish a restoration of the injured forearm to its normal condition; that his diagnosis revealed to him no more than a dislocation, and having properly treated the injury as such no liability attached for results. Defendant not only diagnosed the case as one of dislocation and treated it as such for seven weeks but, in his verified answer to the complaint, he denied that plaintiff's forearm suffered a fracture, although the testimony of Dr. Kauffman and Dr. Hunkin leaves no doubt that both bones of plaintiff's forearm were broken.

It is very clear that defendant made a faulty and erroneous diagnosis of plaintiff's injury and adhered to it during the period of his treatment. Does the evidence sufficiently support the implied finding of the jury that this erroneous diagnosis was illy considered and carelessly or negligently made and not warranted by the facts as they presented themselves to defendant? In solving the question we must give to the evidence such interpretation as the jury gave it, and deduce from it such inferences as the jury deduced, if such interpretation and deduction were such as reasonable men might make in the discharge of their duties as jurymen.

The testimony of Dr. Kauffman was that when plaintiff came to him while still under defendant's care, he discovered at once, by visual and digital examination, that plaintiff's forearm was fractured and this he confirmed by the X-ray. So, also, Dr. Hunkin made the same discovery without using the X-ray. Dr. Kauffman's description of the

condition in which he found plaintiff's wrist at the end of seven weeks' treatment by defendant should have suggested to defendant that something more serious than a dislocation was present. Accepting as true the testimony of Drs. Kauffman and Hunkin (as we must assume that the jury so treated it, and considering other established facts in the case), we cannot say that the jury were without support in finding that had defendant exercised ordinary care and skill when he made his diagnosis he would have discovered the existing fracture, or, if not then, at least at some period during a seven-weeks' treatment. The expert witnesses seemed to agree that in case of doubt the X-ray, if accessible, should be used. There was testimony of the experts that where discoloration existed to the extent here shown, though not conclusive, was indicative of fracture. Defendant testified that he had no doubt of the correctness of his diagnosis. But was he justified, in view of the facts, in closing his mind against any doubt and neglecting an available and accepted means of testing the correctness of his judgment? Defendant's ability and skill as a physician and surgeon seem not to be questioned. The point urged is that in this particular instance he did not exercise the care and skill of which he was capable, and did not "use ordinary care, diligence and skill, according to the circumstances of the case," as the court instructed the jury was his duty.

At the oral argument the attorney for defendant assumed that defendant treated the patient properly for a dislocation and that had the diagnosis been correct the treatment was proper. But we think counsel was in error in assuming that "about the only issue made during the trial was as to whether or not Dr. Barr should have examined the patient, when making his diagnosis, by the X-ray process." Counsel also claimed that it was "after an X-ray had been applied to the injured member that it was discovered, or claimed to have been discovered, that there had been a fracture." We think counsel justified in his assumption that the treatment given by defendant was proper for a dislocation had the defendant's diagnosis been correct. But whether or not defendant should have used an X-ray in making his diagnosis was not the only issue. As to that the experts differed in opinion, and it was shown that surgery had been successfully practiced before the X-ray was discovered. Apart from the conflicting

expert testimony on this point there was testimony by two surgeons who examined plaintiff's wrist, one of whom was practicing in the locality, that the presence of a fracture was revealed readily without the use of the X-ray. May not the jury have been justified in finding that by the exercise of ordinary skill and care defendant would have discovered, at some time during his seven weeks' treatment of plaintiff, what these surgeons saw at once upon examining plaintiff's arm without using the X-ray? May not the jury have been justified in finding that, had defendant used the ordinary skill and care which he possessed, enough evidence of a fracture would have been revealed to him to require of defendant that he verify or test his diagnosis by resorting to the X-ray, which was available to him at the Rideout hospital? It may be conceded that defendant's expert witnesses were correct in their opinion that ordinary skill and care did not require of defendant that he should have used the X-ray in making his diagnosis. But there still remained the question whether the defendant did in fact exercise ordinary care and skill in making his diagnosis, and the still further question whether, had he exercised ordinary care and skill in his treatment he would not have discovered the error in his diagnosis?

Counsel quote as follows from the opinion in *Hesler* v. *California Hospital Co.*, 178 Cal. 764, [ 174 Pac. 654] : ''It is never enough to show''—that is, as against a physician—''that he has not treated his patient in that mode, nor used those measures, which in the opinion of others, even medical men, the case required; because such evidence tends to prove errors of judgment, for which the defendant is not responsible as much as the want of reasonable care and skill, for which he may be responsible.'' citing a New Hampshire case. It may be doubted that the degree of skill and care of a physician in diagnosing and treating disease is the same as that of a surgeon in all cases of surgery. A broken or dislocated member of the body, usually discernible to the eye or the touch of the surgeon, presents an entirely different problem from internal disorders whose manifestations are obscure and often misleading. However this may be, the question is always open to inquiry whether or not the physician or surgeon in a given case did in fact exercise ordinary skill and care. The statement above quoted has reference to the force

of expert or opinion testimony as to whether or not in a given case ordinary care and skill have been shown. In the present case the verdict finds support in facts shown irrespective of expert testimony.

We cannot say that the verdict was without sufficient support.

Error is assigned "in ruling against the introduction of evidence." During the cross-examination of Dr. Kauffman by defendant an offer was made to show by a patient of Dr. Kauffman's, present in court, that he had treated this patient without resort to the X-ray. The purpose was to discredit his testimony. The court sustained plaintiff's objection. To have permitted this would have involved an inquiry into the character of this patient's injury, the diagnosis made and the treatment given, and practically opened up an investigation upon a collateral matter much the same as was being investigated in the case itself. The witness testified that he had treated patients with dislocated and fractured forearms "without subjecting the member to the X-ray process." He also testified that in case of "pure dislocation" the X-ray was not essential. Having had these answers it was not error to rule against exhibiting the witness' patients.

A hypothetical question was propounded to Dr. Kauffman in which the facts in this case were stated and an opinion asked as to the length of time it would take for "the bones to knit and the injury to heal if they were primarily set and if primary attention and treatment were given to the patient?" Objection was made that the question omitted to state "the condition of the patient, nothing at all except the mere fact of the injury." The point now made that his opinion was not founded upon "all the facts of the case goes to the weight of his evidence rather than to its competency or materiality." (*Reardon* v. *Richmond Land Co.*, 21 Cal. App. 357, [131 Pac. 894].)

Error is claimed for misconduct of plaintiff's attorney in seeking to get before the jury statements made by defendant to plaintiff in a conversation between plaintiff and defendant after plaintiff returned from San Francisco. Defendant's attorney moved to strike out all the testimony. "The Court: Strike it out. The jury is instructed to pay no attention to the testimony that has been stricken out, the answer of the witness as to the conversation taking place between

him and Dr. Barr at the time is to be disregarded by you altogether, and treated as though you had not heard it." Plaintiff's attorney put the question in another form and defendant moved to strike out the answer. "The Court: Strike it out; the same injunction as before," turning to the jury, "that you pay no attention to that answer." It was improper for plaintiff's attorney, after a ruling against him, to endeavor to get before the jury in another form the matter ruled out. We must assume, however, that the jury obeyed the court's instructions.

Defendant offered the following instructions, which were refused:

"Unless you find from the evidence that when plaintiff called upon the defendant for treatment, or during the course of the treatment, plaintiff's forearm was fractured, then your verdict must be for defendant.

"Plaintiff in this action alleges that defendant, as a surgeon, examined his forearm in a negligent and careless manner and without exercising ordinary skill, thereby causing the injury and damage claimed by him in his complaint, and I instruct you that the burden rests upon the plaintiff to prove these allegations by a preponderance of the evidence and that if he fails in this respect, you should find your verdict for defendant."

Of the first of these instructions it may be said that although defendant in his answer denied that plaintiff's forearm was fractured, the testimony was uncontradicted that plaintiff's forearm was fractured, and when on the witness-stand defendant made no claim further than that he did not discover any fracture. We think the jury must necessarily have found that plaintiff's forearm was fractured and hence the refusal to give the instruction was not error.

As to the second instruction, the court instructed the jury that "the burden rests upon the plaintiff to prove every material allegation in his complaint and if he has failed in this respect you should find your verdict for defendant." The error now assigned is that the court in its instruction failed to tell the jury that plaintiff must prove every material allegation "by a preponderance of the evidence." This omission we do not think of sufficient importance to justify a reversal. Furthermore, the plaintiff not only alleged negligence in examining plaintiff's forearm, but in its treat-

ment.   The proposed instruction omits this latter feature of the case.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.