[S. F. No. 13333. In Bank.—December 24, 1931.]

ENRICO BELLANDI, as Administrator, etc., Respondent, v. PARK SANITARIUM ASSOCIATION (a Corporation) et al., Appellants.

Hadsell, Sweet & Ingalls and Ford, Johnson & Bourquin for Appellants.

James Walter Scott and Howard Harron for Respondent.

SEAWELL, J.—This cause was instituted and maintained by virtue of the provisions of section 377 of the Code of Civil Procedure, which provide that when the death of a person is caused by the wrongful act or neglect of another, his heirs may maintain an action against the person causing the death.

The appeal is from a judgment entered therein upon the verdict of a jury rendered in the sum of $15,000 in favor of plaintiff as the administrator of the estate of Antonio Bellandi, deceased, and against appellants, Park Sanitarium, a corporation, and Dr. Vincent P. Mulligan, physician and medical director of said Park Sanitarium, and Alice Keeffe, head nurse at said sanitarium, who has since become the

wife of Dr. Vincent P. Mulligan. The latter was also secretary and a member of the board of directors of said corporation. The action was brought by the respondent, a brother of decedent, in his representative capacity for the benefit of Mrs. Elena Bellandi the mother of decedent (sec. 377, Code Civ. Proc.), who succeeded to the *corpus* of her deceased unmarried son's estate. (Sec. 225, Probate Code.) The mother is a native and resident of Italy. Her two sons, Enrico and Antonio, came to this country as young men, Antonio arriving in 1907 at the age of seventeen years. During the sixteen years of his residence in America, which terminated with his death in 1923, he had contributed to his mother's support more than $12,000. His very large and continuous contributions to his mother's support following his father's death in 1916 and his brother's inability to contribute his accustomed share, consequent upon his marriage, which occurred the same year in which the father died, cannot be seriously questioned in the face of the convincing evidence which amply establishes that issue. Upon his brother's marriage Antonio assumed the whole burden of supporting the mother.

It appears from uncontradicted statements in the briefs that this appeal is taken from the fourth trial of the cause. The results of the former trials are not given and are immaterial.

Appellant, a private corporation, conducted in the city of San Francisco a private hospital or sanitarium, for hire, for the care and treatment of mental, nervous and alcoholic cases. The decedent, Antonio Bellandi, was a native of Italy and came to this country in 1907. His brother Enrico, respondent administrator, had preceded him in arriving in America. At the time of his death he was thirty-three years of age, remarkably robust in stature and health. He was a cook and was usually employed in restaurants managed or owned by his brother, and at times for others. The bonds of attachment existing between the brothers and between the decedent and Enrico's family were very strong. His affection for his brother's child and his consideration for his sister-in-law's comfort were quite marked. Having been employed as a cook for some seventeen years continuously, he finally yielded to a growing desire to visit his mother in her native land and bring her to

this country that she might make her home with him. About a week before his death, as hereafter related, he notified his brother of his plans and spoke with him about getting someone to take his place. Antonio spoke but little English and conversed very little except with his brother, his family and those with whom he was intimately acquainted. He shunned the companionship of all females who were not members of the family household. His diffidence or shyness at the feminine sex had been a marked characteristic with him since boyhood, which did not diminish with maturer years. We thus early emphasize this pronounced timidity as a factor to be kept in mind in accounting for his conduct at the time he was placed in charge of female nurses at the sanitarium whose proffered assistance in disrobing him was vehemently declined.

Antonio Bellandi expired at approximately 9 o'clock A. M., June 19, 1923. He returned to his brother's home at about 2 o'clock on the morning of June 18th—the day before he died—having completed his night shift as a cook. The next day he was to start on his journey to the old country, stopping at Los Angeles en route to visit for a few days with a sister. He went to bed as usual on the morning of the 18th, but later in the day his brother Enrico and his wife noted that Antonio was unusually loquacious and somewhat excited concerning his trip to Italy. There was sufficient in his manner to cause the brother, in view of the journey he was to begin, to have a physician examine him before leaving on his trip. This was agreed upon and Dr. Edward Ghidella, whom Antonio and his brother had known for many years, was called. Dr. Ghidella was a graduate of several famous medical colleges, had associated with eminent alienists, and was experienced both as a physician and alienist. He had served in the United States army as a surgeon and physician and was later connected with the Letterman Hospital. There can be no doubt as to his wide experience with nervous diseases. Upon his arrival at the Bellandi home he made a physical examination of Antonio and found his heart and lungs to be in perfect condition. He described him as a perfect specimen of a man, thirty-three years of age. He found him overexcited in preparing for his journey to Italy to visit his mother, but he exhibited no signs of insanity, as that term is

medically known. Antonio complained to him of stomach trouble and he gave him a prescription of bromide and a large dose of epsom salts, and left the case feeling perfectly sure that the patient was not dangerous to himself or to others. The only abnormal thing which the doctor, who had known the deceased through many years, had observed was his bashfulness with respect to women and his inordinate desire to see his mother. He was in no sense violent. The doctor diagnosed his case as one of acute neurasthenia. The deceased was so strongly affected with the one desire to see his mother that he was greatly excited, but he was not violent. It was, in his opinion, a temporary condition, and would have been relieved by making the trip and seeing his mother. Antonio took but one dose of bromide. He had been packing his trunk and preparing for his trip until about midnight when his brother returned home from his restaurant. Antonio was still quite voluble and excited, and Enrico attempted to call the doctor, but as the latter was then engaged he advised that Antonio be taken to the Franklin Hospital, an institution which he visited. Accordingly Enrico, his wife and brother-in-law took Antonio to the hospital in a taxicab. He was assigned to a room and after entering it a female nurse followed him in and attempted to assist him in removing his jacket. In an excited and loud voice he ordered her out of his room. At about the same time another nurse entered with a pillow, whereupon he said to her in a loud voice that he did not want anyone in his room. From this the head nurse concluded that he was noisy, and as the hospital did not receive nervous cases and as many serious operations were constantly being performed in said hospital, she insisted that Antonio be taken to some other hospital. He had retired, but when informed by his sister-in-law that he could not remain, he replied: ''All right, you go away from my room and I dress myself and I go away.'' He dressed himself and left with his relatives, who took him to the emergency hospital in a taxicab, but on the advice of the person in charge of said emergency hospital they took him to the Park Sanitarium, arriving at about 1:30 A. M. The night woman nurse, who was not a trained nurse, admitted the party and was particularly informed as to Antonio's extreme diffidence

with respect to women. She replied that they had a male nurse to take charge of him. He was assigned to a room on the third floor, the floor that was set apart for the treatment of severe mental and alcoholic cases. No examination was made of him nor was any treatment of any kind administered. His entire clothing was removed and taken from the room. The room contained neither toilet conveniences nor mechanical call or alarm device. The situation was strange to him and he was totally unacquainted with the attendants. He slept until about 5 o'clock A. M. when he desired to go to the toilet, as he had taken a heavy dose of salts several hours before. He attracted the attention of the nurse by whistling. The male nurse responded to his call. While being taken to the toilet without clothing and with nothing but a sheet wrapped about him, he found himself unexpectedly confronted by a female nurse, and he said to her, "Don't touch me, if you do I will kill you, I am an Italian." He made no attempt, however, to do violence to anyone. He was soon thereafter transferred to the "strong room", which was a room with barred windows, a double door, and a bed chained to the floor with a mattress thereon. The door was locked. There he remained without making any disturbance until about 7:30 A. M. he broke the panels of the doors and got into the hall, and went into the room of Mr. Swanson, a patient, and asked him for some clothes, as he wanted to get out and go. Swanson testified that he talked rationally to him and he told Antonio that he had no clothing except the bathrobe which he was wearing. The deceased offered to buy clothing and requested Swanson to call a taxi. Swanson and Antonio walked up and down the hall for some time. Presently Hazel Herdman, a nurse, appeared upon the floor and Antonio, wrapped in a sheet, approached her, and asked her for his clothing and requested that she call a taxicab for him. She started to leave him to ring the emergency bell, whereupon he grabbed or took her by the arm to detain her, when she commanded him to "leave her alone".

At this juncture another patient, Mr. Cruise, who was quite a large man, came from his room fully dressed and ordered him to "leave that nurse alone". Upon being thus addressed Antonio left Miss Herdman and, engaging

Mr. Cruise, asked him for his clothes. They then went into Mr. Cruise's room. Miss Herdman, the nurse from whom he had attempted to recover his clothing, testified that all the deceased wanted was his clothing. He wanted to go home. He kept asking for his clothing. He made no threats. She said: "Aside from taking hold of my arm he didn't take hold of me in any other way at all." He requested Cruise to let him have his clothes. At about this time Dr. Mulligan stepped from the elevator. Miss Herdman said to Dr. Mulligan that there was a patient (meaning Antonio) whom she thought he should see about. The patient was then in Mr. Cruise's room. Shortly thereafter Dr. Mulligan was seen pursuing the patient with an uptaised chair up and down the hall. Antonio crashed against one or two doors in an effort to escape as he ran. The commotion brought several nurses to the hall, male and female. Dr. Mulligan called to a male nurse to trip Antonio, who was a very powerful man, which he did, and Antonio fell to the floor.

He was immediately set upon by Dr. Mulligan and some five or six nurses. In the struggle, which seems to have lasted from thirty to forty-five minutes, two of Dr. Mulligan's fingers were bitten by the deceased. Antonio never thereafter rose from the floor, as his body was held down by said physician and attendants. Straps and other restraining apparatus were furnished, but not used. Instead a tourniquet was improvised with the aid of a towel by Dr. Mulligan. A tourniquet consists of placing a strap or towel about the neck and drawing it so tightly that it produces a cerebro-anemia—a stoppage of the flow of blood to the brain. The use of the tourniquet continued quite a long time. Its efficacy in subduing the patient was strengthened by the free use of ether. While the struggle was in progress a nurse was ordered to go to a near-by drug-store and procure a pound can of ether, which was vigorously applied to the patient. According to the testimony of one of the nurses, practically the whole content of the can was literally poured upon a piece of gauze, which was placed over the nose and mouth. The attention of the doctor was called to the cyanotic condition of the patient during the protracted struggle, and also the necessity of giving the patient air was suggested, but the reply

was that he would give him nothing. The use of other language was testified to, which, if believed, would indicate that the doctor was greatly excited. At about 9 o'clock A. M. Dr. Edward Solomon, who had a patient at the hospital, stepped from the elevator and observed Dr. Mulligan with a patient on the floor over whom he was reclining. The patient looked blue and he called Dr. Mulligan's attention to his appearance. He went a little closer and noticed that the patient's pupils were dilated, and he felt his pulse and found that he had no pulse. He was then dead. An attempt on his part at restoration proved futile. Some two hours thereafter the deputy coroner and a police officer called at the hospital, and as they moved the body they noticed a strong odor of ether and the doctor was asked where the ether was coming from and he replied that there was no ether there; that none was used. The soiled condition of the floor gave evidence of the physical and mental suffering that Antonio endured while the struggle lasted. Witnesses testified to statements made by the doctor and certain nurses immediately following the fatality which would tend to account for Antonio Bellandi's death on grounds of natural causes and exculpate the persons connected with the hospital from blame by suppressing the intensity of the struggle and the kind of force and methods used to overcome him. Very substantial evidence was adduced at the trial which tends strongly to support the contention of respondent that decedent was etherized or choked to death. There are grounds for claiming that either of the methods adopted, as described by certain witnesses, would probably have resulted fatally. Very eminent alienists testified that either of the methods resorted to was improper and fraught with danger and that such modes of restraint are not used in the state hospitals or in orderly conducted private institutions.

Institutions which receive persons affected with nervous diseases for hire should be supplied with reasonable devices of restraint, such as straps, jackets, wristlets, anklets, blankets and other approved apparatus, and also sufficient man power to take care of violent cases, which may develop at any moment, at the least minimum of danger to the patient. While the appellant hospital seems to have been supplied with restraining straps, it did not use them.

■ In considering the appeal we have, as we must do under the rule, considered the evidence adduced by the respondent and its sufficiency to support the implied finding of the jury. It is true, that the facts above reviewed were disputed by Dr. Mulligan and witnesses produced by him as to the manner in which said Antonio Bellandi was handled and as to the cause of death. We have not set out all of the evidence upon which respondent relies, but sufficient only to show that there is substantial evidence in the record to support the finding of improper and negligent treatment of the decedent by the agents of appellant hospital. The question of credibility of the witnesses has been determined by the jury and the trial court, and their finding on that issue is conclusive on this court. Much evidence was introduced on both sides and a number of the state's most eminent alienists or psychiatrists testified in the case, giving the weight of their opinion to one side or the other. If the jury accepted the testimony of those who appeared for the respondent and described the treatment to which the decedent was subjected, we need not go into the question as to whether the attending physician used the degree of skill ordinarily possessed by reputable physicians engaged in the practice of a special branch of science in the locality where the treatment was administered, for the reason that scientific knowledge is not essential for the determination of an obvious fact. But if medical learning is necessary to guide the mind of the unskilled as to whether the treatment was proper, there is ample evidence of physicians and alienists in the record to support the verdict and judgment on the issue of improper or negligent treatment.

■ Appellants make the further objection to the judgment that the decedent was entering the realm of insanity and, therefore, his learning power was gone, and for like reason the basis of a claim for loss of society or comfort could not exist.

The probability that the deceased's condition was no more than temporary and that the prognosis was reasonably favorable for a complete restoration to health is a question which must be submitted to medical skill, and its answer on matters which are beyond the ken of the layman furnishes a basis upon which courts of law may predicate a judgment. The judgment in this respect finds support in the testimony

of certain alienists called on behalf of respondent. The mental condition was one of excitability superinduced by a letdown from a long period of assiduous labor and the anticipation of meeting his mother and visiting the scenes of his boyhood. His condition did not come upon him by slow development, and, therefore, was not chronic, nor did it have the appearance of settled insanity. It was a sudden outburst, which frequently yields to rest and treatment. On this subject the physicians have spoken. While there may be room for doubt as to what the prognosis as to a complete restoration to health may have been, we are bound by the finding of the jury on this as on all other issues where there is any evidence which reasonably tends to support the verdict notwithstanding evidence of a contrary nature.

■ Appellants complain that the award of damages is grossly excessive in the circumstances of the case. We agree that the judgment does seem quite large, and it is possibly larger than we would have awarded if sitting as a jury or judges in the case. But on the other hand the evidence lends support to it. Unquestionably Antonio, who commanded quite a large salary as a cook, going as high as $150 per month, sent practically all of his earnings less the niggardly amount which he required for his personal wants to his mother. This in the aggregate exceeded $12,000 for the fifteen or sixteen years he lived in America. At the time of the trial the mother's life expectancy was a fraction more than nine years. Four years had then passed since the son's death. The four years passed, plus the nine years of expectancy, would equal thirteen years. We cannot say, in the face of the evidence, that the amount of the award is so large as to suggest passion or prejudice or corruption on the part of the jury.

■ We have examined the instructions delivered to the jury and find no error in them. Appellants complain that the court rejected several proposed instructions requested by the defendants which should have been given. Said rejected instructions contained no principle of law not embraced in those given. Furthermore, said refused instructions were objectionable in the amplified and argumentative form in which they were cast.

■

■ Exceptions are taken to the court's ruling on matters of evidence. The rulings complained of, if conceded to be error, did not in all probability influence the jury in the slightest degree in its determination. The matters complained of are of small importance and it would not be helpful to review them in detail. One which appellants stress is the court's ruling on the question of Enrico, the living brother, having once been ill with a mental disturbance. This was doubtless done for the purpose of placing before the jury, as a fact, that insanity was congenital in the Bellandi family. The methods of introducing such a suggestion did not conform to the rules of evidence and the subject matter, if admitted, was not convincing.

Judgment affirmed.

Richards, J., Shenk, J., Waste, C. J., Preston, J., and Langdon, J., concurred.

Rehearing denied.