[L. A. No. 15552. In Bank.—April 18, 1936.]

CLIFTON R. McBRIDE, Appellant, v. DR. JOSEPH SAYLIN et al., Respondents.

135

Ben F. Griffith and Malcolm Archbald for Appellant.

W. I. Gilbert for Respondents.

SHENK, J.—In this case a petition for hearing after decision of the District Court of Appeal, Second Appellate District, Division One, was granted for the reason that there appeared to be some merit in the contention of the defendants that the District Court of Appeal, in concluding that the evidence showed a *prima facie* cause of actionable malpractice, applied a test not sanctioned by the decided cases, and further because of the pendency before this court at that time of a petition for hearing in the case of *Forbis* v. *Holzman*, (Cal. App.) 45 Pac. (2d) 215, which has now been finally determined. (*Forbis* v. *Holzman*, 5 Cal. (2d) 407 [55 Pac. (2d) 201].) Upon a further consideration of the merits of the contention and the evidence appearing in the record in this case, we have arrived at the conclusion that the plaintiff introduced evidence which, under the applicable test, required a submission of the case to the jury.

It is apparent that by the opinion of the District Court of Appeal it was not intended to change or alter the test required by law in such cases, which is: Was the treatment given by the defendant consistent with that reasonable degree of learning and skill usually possessed and rendered by others of his profession in the same locality under similar circumstances, having regard to the state of scientific learning at the time? By the use of the term "customary means" either in the testimony or the opinion of the District Court of Appeal, it is not to be supposed that the District Court of Appeal

intended to announce a rule that compliance with the test required the use of such customary means only, if a means were employed or were available which would conform to the test stated or to a higher standard. As thus understood the opinion of the District Court of Appeal does not contravene the rule as announced in such cases as *Patterson* v. *Marcus,* 203 Cal. 550 [265 Pac. 222] , *Hesler* v. *California Hospital Co.,* 178 Cal. 764, 766 [174 Pac. 654], and *Houghton* v. *Dickson,* 29 Cal. App. 321, 325 [155 Pac. 128], relied upon by the defendants. We therefore adopt as the opinion of this court, the following portions of the opinion of said District Court of Appeal, prepared by Mr. Justice Edmonds *(pro tem.)* :

"Plaintiff sued the defendant physicians for alleged malpractice in the treatment of an injury. The trial court granted a motion for a nonsuit and entered judgment accordingly.

"The injury suffered by the plaintiff was sustained on August 23d when the head of a nail struck him in the eye. He went for treatment to a medical office owned by the defendant Saylin and operated under the fictitious name of Venice Industrial Emergency Hospital. There he saw Dr. Bulpitt, who was working for Dr. Saylin under a written contract 'as resident physician and surgeon of the Venice Industrial Emergency Hospital . . . and as assistant in the general practice of medicine and surgery', on a percentage basis with a minimum salary guaranteed.

"According to the testimony of the plaintiff, he told Dr. Bulpitt that he had been struck in the eye by a nail head. The doctor examined the eye with a magnifying glass, and found a lineal laceration of the cornea, with air bubbles present. He removed some particles of rust from the eye, but he did not examine the laceration to see how far it extended, nor did he attempt to extract anything therefrom. The eye was washed out with boric acid, argyrol solution was instilled and the eye covered with a pad. Plaintiff returned each day for treatments which consisted of washing out the eye and instilling the argyrol. On September 3rd, according to plaintiff's testimony, Dr. Bulpitt told him that it would not be necessary to have further treatment. Under date of September 6th Dr. Saylin signed and sent to the insurance carrier of plaintiff's employer a 'Surgeon's Final Report', stating

that first aid had been rendered by him, with professional services thereafter until September 3rd, and that the results were 'Recovery'.

"On October 23rd plaintiff returned to Dr. Bulpitt, complaining of pain in the eye and diminishing sight. Dr. Bulpitt treated him for seven days, when he sent him to Dr. Morgan, and later to Dr. Osburn, both eye specialists. When Dr. Osburn examined the eye he found a piece of steel in it which he removed. Some days after this operation the retina collapsed and plaintiff finally lost the entire sight of the eye.

"Dr. Osburn and another physician were called and testified for plaintiff and the points presented on appeal arise from their testimony. In addition to the questions asked of Dr. Osburn concerning the condition of the eye as he found it and the treatment he gave the plaintiff, the two physicians were asked more than sixty questions seeking to bring out that Dr. Bulpitt was negligent in not looking for and finding the piece of steel in plaintiff's eye at the time of the injury, and that the loss of sight resulted from the foreign body remaining in the eye until removed by Dr. Osburn. The trial court sustained objections to practically all of these questions.

Plaintiff, however, presents as the first point on appeal that the evidence adduced by the few questions which were allowed to be answered proved a *prima facie* case. Error is also predicated upon the rulings sustaining objections to plaintiff's offered evidence.

"The scant evidence received shows that when Dr. Osburn examined the plaintiff's eye in October he found a puncturing injury in the cornea, and directly behind it a window or tear in the iris with scars and inflamed vitreous; that by the use of an ophthalmoscope an opaque object was shown to be imbedded in the vitreous; and that this was a piece of steel which was removed in an operation taking about ten minutes. Dr. Osburn expressed the opinion that the piece of steel was probably in the same position when found by him as when it came to rest; that the loss of sight was caused by the entrance, presence and removal of a foreign body; that the route the object took did not necessarily cause the eye to become blind; that the removal had nothing to do with the loss of vision, and that the length of time the particle stayed in the eye contributed considerably to the loss of vision, due to the inflammation resulting from its presence. Dr. Peters testified that

the customary means used by physicians and surgeons to determine the presence or absence of a foreign body in the eye are the ophthalmoscope and the X-ray.

"Under the settled law of this state this evidence was sufficient to prove a *prima facie* case. (*Estate of Lances*, 216 Cal. 397 [14 Pac. (2d) 768].) The legitimate inference which may be drawn from it is that Dr. Bulpitt should have suspected the presence of a foreign body in the eye; that he failed to exercise that degree of care which the practice of his profession requires, in failing to make such examination as would make reasonably certain that there was nothing in the eye; and that this was the proximate cause of the serious and unfortunate injury to plaintiff. The evidence would support such findings, and the action of the trial court in granting the motion for a nonsuit was unwarranted.

"From the evidence in this case it is difficult to understand how a physician looking at plaintiff's injured eye with air bubbles present and the laceration before him, could feel that he had exercised ordinary professional care and skill without making any examination to see how deeply the injury extended, or doing anything to give reasonable assurance that there was no foreign body in the eye. Dr. Bulpitt had an X-ray in his office but made no use of it in connection with plaintiff's injury. It would seem that with an injury to a portion of the human body as delicate and important as the eye, ordinary" professional "care and skill would at once suggest the importance of the most careful examination. In *Reynolds* v. *Struble*, 128 Cal. App. 716, 725 [18 Pac. (2d) 690], in discussing the failure of a physician to use the X-ray in connection with the diagnosis of an injury, the court said: 'There is further evidence that ordinary skill and care required the use of the X-ray as an essential aid to a skilful diagnosis, employing that skill and care possessed and used by the ordinary practitioner in that community. Indeed, it might be almost said that the use of the X-ray as an aid to diagnosis in cases of fracture or other indicated cases, is a matter of common knowledge. Even the layman, when injured, of his own accord seeks the X-ray. And under the rule of *Jacobson* v. *Massachusetts*, 197 U. S. 11 [25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765], the court could, in the absence of testimony, take judicial notice of this scientific advancement.'

"Also, the evidence establishes sufficiently at least for a *prima facie* case, that Dr. Bulpitt's lack of" professional "care" and skill "was the proximate cause of the loss of sight. 'If . . . it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.' (*Dimock* v. *Miller,* 202 Cal. 668, 671 [262 Pac. 311].)"

The judgment is reversed.

Seawell, J., Curtis, J., Langdon, J., and Waste, C. J., concurred.