[Civ. No. 16504.   First Dist., Div. One.   Feb. 20, 1956.]

WILLIAM FRIEDMAN, Appellant, v. RUDOLPH L. DRESEL, Respondent.

Lewis, Field & DeGoff, Marvin E. Lewis, Martin E. Field and Sidney F. DeGoff for Appellant.

Peart, Baraty & Hassard and George A. Smith for Respondent.

PETERS, P. J.—In this action for malpractice the plaintiff charged the defendant doctor with negligence in making a faulty diagnosis of a fractured hip, in prescribing the wrong treatment, and in failing to take X-rays of the injured area. The jury returned a defense verdict. Plaintiff appeals, directing his main attack on certain instructions.

The plaintiff, William Friedman, was 57 years of age in November of 1951. At that time he was a buyer for Granat Brothers for whom he had worked for some 34 years. In March of 1951 plaintiff was hospitalized and it was determined by Dr. O. W. Jones, Jr., a neurosurgeon, that plaintiff had a brain tumor. This evidenced itself partly by a weakness and awkwardness of the left side of his body. This included a mild weakness of the left leg. Dr. Jones operated and removed the tumor on March 9, 1951, and plaintiff was discharged from the hospital on April 14, 1951, in good condition, and improving all the time. Thereafter, in May of 1951 plaintiff suffered an epileptic convulsion. Dr. Jones then found that the convulsion left plaintiff with a marked weakness on the left side of his body, the left arm and leg being stiff and weak. Dr. Jones prescribed the usual treatment—heat, massage, use of walkers and other physiotherapy. Such convulsions are a frequent aftermath of a brain tumor operation. After this first convulsion, plaintiff was released from the hospital on June 8, 1951, and thereafter suffered several other epileptic seizures.

Plaintiff, and several of his witnesses, testified that by November 21, 1951, plaintiff's condition was good; that he could walk everywhere he wanted without a cane or other assistance; and that he had only a slight hindrance of the left leg. On November 21, 1951, plaintiff, while at work, tripped and fell, landing on the left side of his buttocks. He was unable to get up, and had what he described as "terrific pain" from above the left knee up the leg to the hip. He was taken to the hospital by ambulance where he was put under the care of Dr. Davis, who had been called in by plaintiff's employer. At this time Dr. Davis had an X-ray of the knee taken. No X-ray of the hip was taken. Several days later Dr. Davis called in the defendant doctor who is a qualified orthopedic surgeon. Dr. Davis told the defendant about the past history of the case, including the brain operation and subsequent convulsions, and also told him about the fall. Dr. Davis also told defendant that plaintiff had "point tenderness" on the side of the left knee and

probably had some ligament damage to that knee. The defendant testified that he then examined plaintiff at the hospital on November 26, 1951, and found him very irritable and tense. Defendant first read the history and the chart, and then asked plaintiff to point out where it hurt. According to defendant, the plaintiff pointed to a spot directly over the internal lateral ligament of the knee. Defendant testified that he then asked if it hurt anywhere else, to which plaintiff replied: "No, this is the only point of pain." Defendant stated that he then examined plaintiff and found that plaintiff's left arm was in "flexion and adduction," similar to the condition after a stroke. "Flexion" is a binding of the joint, while "adduction" is a motion towards the center. Plaintiff's hip was also in flexion and adduction and his knee was in flexion. The defendant testified that he then "splinted" the knee with his hands and asked plaintiff to flex his hip, but plaintiff again complained of pain in the knee; that he had plaintiff hold his leg out at 30 degrees and plaintiff made no complaint of any pain in the hip; that he then examined the left knee and saw that it was swollen; that he noted that there was a tenderness directly over the internal lateral ligament of the knee; and that after various strain tests found a moderate tear in the internal lateral ligament of the knee. The defendant also noted that the hip muscles were tight and rigid, which corroborated a condition of spasticity caused by the brain condition.

Dr. Davis, before calling in the defendant, had prescribed a walker for plaintiff, gentle massage and active motion. Defendant testified that after he had examined plaintiff and had diagnosed the condition as a moderately severe sprain of the inner ligament of the knee, he recommended the continuation of this treatment. Defendant continued to see plaintiff from time to time until December 29, 1951, when plaintiff was discharged from the hospital. According to defendant, plaintiff at no time made any complaint of pain in the left hip.

During this period defendant also consulted Dr. Jones and had him examine plaintiff on December 7, 1951. Dr. Jones tested and manipulated plaintiff's extremities, tested his cranial nerves and reflexes, and had plaintiff move about. Plaintiff complained of pain in the back of his left knee and no other pain. Specifically, he did not complain of pain in the hip. According to Dr. Jones there was nothing in

plaintiff's condition that suggested any injury to the hip. Plaintiff's left extremities were weak, and his left knee slightly flexed, even when standing.

Dr. Davis testified that when he was called in on November 21, 1951, he ordered an X-ray of the knee because the patient complained of pain in that area. Neither from complaints nor from his examination did Dr. Davis find anything to suggest any involvement of the hip. Dr. Davis diagnosed the condition as a contusion of the left knee, with probable involvement of one of the ligaments of that knee. The knee, when first observed by Dr. Davis, was swollen and discolored and plaintiff complained of pain upon its manipulation. Dr. Davis was in complete accord with the diagnosis later made by defendant. Dr. Davis saw plaintiff quite frequently up to January 31, 1952, and during this period made periodic examinations. During this period he did not observe plaintiff's leg in a position of external rotation, which would have indicated a hip fracture. He did notice this condition on January 31, 1952, when plaintiff was readmitted to the hospital, and X-rays of the hip then taken disclosed a fracture in that area.

The discovery of the hip fracture was made by Dr. Jones, who, while examining plaintiff on January 31, 1952, for the first time, noted that there were indications of a hip fracture—external rotation, and a shortening of the leg. Dr. Jones had last examined plaintiff on December 7, 1951, and at that time did not notice these conditions. Dr. Jones recommended that X-rays be taken, and the fracture was discovered. · Dr. Jones opined that the fracture of the hip occurred as a result of the fall of November 21, 1951.

The X-ray report rendered on January 31, 1952, indicated a fracture of the left neck of the femur; that the shaft was displaced upward; and that there was a moderate rotation of the shaft. Because of the condition of the bony structure which was set forth, the report concludes that "These findings are suggestive of Paget's disease."

After the X-ray of the hip was taken defendant again examined plaintiff. He discovered that spasticity was less than it had been, that plaintiff was able to extend his left leg, and that that leg was now about one inch shorter than the right. He also discovered that the left leg had rotated so as to indicate a fractured hip. No such rotation had been observed prior to January 31, 1952. There was now no complaint of knee pain, nor was there any complaint of hip

pain, even when the hip was pumped. Defendant, at the trial, testified that, based on his many examinations, he was of the opinion that plaintiff did not sustain the hip fracture as a result of the fall of November 21, 1951. However, in a letter to the Industrial Indemnity Company prior to trial defendant had given the opinion that the fracture of the hip did occur at the time of the fall.

Another orthopedic surgeon, Dr. Jergesen, was called in to examine plaintiff, which he did on February 2, 1952. He also consulted defendant. He found that plaintiff had a fracture of the neck of the left femur and was suffering from Paget's disease, a disease which causes a weakening of the bones. There was a displacement and a demineralization of the left thigh. When Dr. Jergesen first examined plaintiff the patient did not complain of pain, but when examined on March 12, 1952, he did complain to Dr. Jergesen of pain on the inner side of the lower left thigh. Dr. Jergesen thought it quite unusual that plaintiff had not complained of pain in his hip. Dr. Jergesen could not fix the date of the fracture, simply stating that it could have occurred anytime between November of 1951, and January of 1952. He also stated that a fracture may occur to a person suffering from Paget's disease without trauma, or as a result of a very minimal trauma. When he took over the case he prescribed a continuation of the exercising and physiotherapy. Between March 12, 1952, and June 29, 1952, plaintiff was mobile in the sense that he could and did get around with the help of a cane. But, because plaintiff failed to progress properly, Dr. Jergesen advised surgery, and plaintiff entered the hospital for this purpose on June 29, 1952. Thereafter, Dr. Jergesen performed two operations on plaintiff. In the last operation he removed the head of the femur and replaced it with a metal prosthesis. A pathological examination of the removed bone confirmed the diagnosis that plaintiff had Paget's disease in the hip area.

Dr. Jergesen also testified that it is the general practice of orthopedic surgeons to order X-rays of any particular part of the body whenever the doctor's examination or the history of the case discloses that such part of the body might be involved—that is, when there is something in the case that directs the doctor's attention to that part of the body and so makes him think an X-ray would be of value. An X-ray is not taken unless there is a good valid reason for doing so.

If a patient suffers a fall and complains of pain in his left knee and the clinical examination does not disclose hip involvement, no X-ray of the hip would be ordered. Dr. Jergesen was further of the opinion that the fracture here involved was a pathological one, that is, one that occurs in a diseased area of the bone, causing a structural failure of the bone. Such could occur as the result of Paget's disease, with or without trauma. He also testified that he had never seen a case of referred pain in a knee from a hip fracture without pain also in the hip.

Defendant made some admissions which are emphasized by plaintiff. He stated that he knew that plaintiff had fallen on his buttocks and that an orthopedic specialist always thinks about the possibility of a fractured hip when a person over 50 has a fall, because a hip fracture is a common occurrence with such people. He admitted that where there is a fracture of the hip, pain can be referred along certain nerves to a spot above the knee on the inner side, and, in rare cases, to the lower two-thirds of the thigh. He also admitted that the pain described by plaintiff was more severe than is normal with a sprained knee. He conceded that where a fracture occurs the bones should be immobilized as far as possible to allow the bones to knit. In his deposition defendant stated that, had he known of the hip fracture, he would not have ordered mobilization, but on the trial he stated that immobilization would not have been the best treatment for plaintiff.

Dr. Gorham, a general practitioner with some experience in the orthopedic field, was called as an expert for plaintiff. He testified, in response to a hypothetical question, that, in his opinion, under the circumstances, an X-ray should have been taken of plaintiff's hip. He also was of the opinion that failure to reduce the fracture and immobilize the hip caused serious damage to the plaintiff.

Plaintiff and his wife told stories sharply conflicting, in several respects, with that of defendant and his witnesses. Plaintiff testified that when he fell on November 21, 1951, he had a "terrific" pain extending from above his knee up to his hip; that when he arrived at the hospital, Dr. Davis, without examination, ordered the X-ray of the knee; that neither then nor at any other time did he ever tell Dr. Davis or defendant that he had pain in the knee; that, although Dr. Davis and defendant frequently visited him at the hospital, they never examined his leg; that defendant would

customarily come into his hospital room, pat him on the head and tell him that he was getting along fine; that he kept telling defendant and the nurses that he was in terrific pain, but defendant paid no attention to these complaints; that defendant never pulled the covers back to look at the leg, nor did he ever measure it, or manipulate it; that about a week after his arrival at the hospital defendant directed that he use the walker, and also that he be walked by the nurses; that such treatments were given daily; that he frequently screamed with pain during such treatments; that he noticed his leg was getting shorter before he left the hospital on December 29, 1951, and also noted that the leg was turned out; that after he came home from the hospital defendant visited him at his home and stated that he could not understand why he could not walk, and ordered a built-up shoe for the left foot; that since the hip operation he has been unable to work; in fact, unable to walk, unassisted.

Mrs. Friedman corroborated most of her husband's testimony. She also testified that, after her husband was in the hospital for some time and did not seem to be getting any better she consulted defendant and told him that her husband suffered terrific pain; that defendant told her there was nothing wrong with her husband's leg; that all his trouble was in his head; that if there were a fire in the hospital her husband would be the first one to run out; that when she suggested she retain a private nurse defendant said: "Get him a blonde and he'll chase her all over the hospital"; that she visited her husband daily when he was being exercised in the walker, and her husband always complained of great pain; that she told defendant of this fact and defendant agreed to meet her at the hospital to discuss the matter; that at this meeting she told defendant that while in the walker her husband's left foot could not reach the floor, and that she thought that the left leg was shorter than the right; that she asked the doctor to have her husband placed in a walker so that she could show him these facts, but he refused to do so, saying it was unnecessary. She also then asked defendant to take some more X-rays, but he refused, saying that it was unnecessary; that after her husband came home from the hospital on December 29, 1951, defendant ordered her husband to wear a shoe with a raised heel on his left foot; that at that time she told defendant she thought the left leg was shorter than the right but defendant

stated that this was not so, that it was just the way plaintiff held his leg; that after the X-ray of the hip was taken defendant told her "I must admit he must have had a fracture, but it was a clean one and broke through by walking on it"; that defendant said nothing when she stated that he had advised walking on the injured leg; that she had heard defendant at the hospital order the walking exercises; that her husband's complaints were always of pain above the knee and running up to his hip.

It is obvious from this summary that the evidence was highly conflicting, and that a finding either for or against the defendant finds support in the record. If the evidence produced by the defense is believed, we have a patient who suffered a fall and complained of pain in his left knee. The left knee was swollen and discolored. X-rays disclosed no fracture of the knee, but examination disclosed a torn ligament which was properly treated. There was nothing to indicate to a reasonably competent doctor that the hip was fractured or in any way involved. The prior brain operation explained many of plaintiff's symptoms. There was evidence that the hip fracture was not the result of the fall of November 21, 1951, but occurred as the result of disease.

On the other hand, if the evidence produced by the plaintiff is to be believed, the plaintiff at no time complained to anyone of any pain in his knee, always indicating that the pain went up his leg to his hip; that defendant evidenced no interest in his complaints, but assumed that they were the neurotic complaints of a man with an injured brain; that in spite of the fact that the left leg was shorter than the right and turned outwards, sure indicia of a hip fracture, and although these facts were called to defendant's attention, he refused and failed to examine the leg and to have further X-rays taken; that in spite of pain complaints which even defendant admitted were much more severe than would be present with a knee sprain, defendant made no examination but ordered treatment that was proper for a knee sprain but highly dangerous for a man with a fractured hip. In other words, if plaintiff's testimony is believed, it is a reasonable inference that, although defendant had knowledge of facts and complaints that would have placed any reasonably competent doctor on notice that there was a hip involvement, he, without taking the precaution of having an X-ray taken or of examining the injured area, ordered treatment that resulted in serious damage.

On this state of the record the trial judge gave the following challenged instructions:

"In determining whether defendant Dr. Rudolph L. Dresel's learning, skill and conduct fulfilled the duties imposed on him by law, as they have been stated to you, you are not permitted to set up arbitrarily a standard of your own. The standard, I remind you, was set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing, in the same locality, at the same time. It follows, therefore, that the only way you may properly learn that standard is through evidence presented in this trial by physicians and surgeons called as expert witnesses."

"The testimony of lay witnesses in this case, including the plaintiff, who are not members of the medical profession, is not to be and cannot be considered by you upon any question relating to the skill and care, or want of it, possessed and exercised by the defendant Dr. Rudolph L. Dresel.

"In this case there has been a conflict in the testimony of expert witnesses concerning the nature, extent, and cause of the injuries, if any, sustained by plaintiff.

"You must resolve that conflict. To that end, you must weigh one expert's opinion against that of another, the reasons given by one against those of another, and the relative credibility and knowledge of the experts who have testified. Thereupon you shall find in favor of that expert testimony which, in your opinion, is entitled to the greater weight."

These instructions correctly state the general rule that ordinarily the standard of care of a doctor, and whether he exercised such care, can be established only by the testimony of experts in the field. (*Lawless* v. *Calaway*, 24 Cal.2d 81 [147 P.2d 604]; *Engelking* v. *Carlson*, 13 Cal.2d 216 [88 P.2d 695]; *Trindle* v. *Wheeler*, 23 Cal.2d 330 [143 P.2d 932]; *Callahan* v. *Hahnemann Hospital*, 1 Cal.2d 447 [35 P.2d 536]; *Bellandi* v. *Park Sanitarium Assn.*, 214 Cal. 472 [6 P.2d 508].) But to that rule there is an exception that is as well settled as the rule itself, and that is where "negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact." (*Lawless* v. *Calaway*, 24 Cal.2d 81, 86 [147 P.2d 604]; see also *Ales* v.

*Ryan,* 8 Cal.2d 82 [64 P.2d 409]; *Barham* v. *Widing,* 210 Cal. 206 [291 P. 173]; *McCollum* v. *Barr,* 38 Cal.App. 411 [176 P. 463]; *McBride* v. *Saylin,* 6 Cal.2d 134 [56 P.2d 941]; *Rankin* v. *Mills,* 207 Cal. 438 [278 P. 1044].)

There can be no doubt but that if plaintiff's evidence was believed, the exception to the rule and not the general rule was applicable. A case directly in point is *Agnew* v. *City of Los Angeles,* 82 Cal.App.2d 616 [186 P.2d 450]. In that case, after plaintiff had fallen, a doctor, without examining the patient, accepted the diagnosis of the receiving hospital, and, in spite of complaints by the patient, failed to examine her or have an X-ray taken. She had a fractured hip. The plaintiff was unable to produce expert testimony that the doctor had failed to use that degree of skill and learning ordinarily possessed by physicians of good standing practicing in the community. The trial court granted a nonsuit for that reason. The appellate court reversed. In so doing, the following statements of law and fact were made (p. 619):

"*General Rule.* The law requires that a physician shall have that degree of skill and learning ordinarily possessed by physicians of good standing practicing in the same locality, and that he shall use the same care and diligence in applying that learning to the treatment of a patient. It is likewise the general rule that whether he has done so in a particular case is a question for experts and can be established only by their testimony. [Citing a case.]

"*General Exception.* To the above general rule there is this well-recognized exception, to wit, where the question of the propriety of the treatment is a matter of common knowledge of laymen, expert testimony is unnecessary in order to establish liability in a malpractice case.

"*Specific Exception.* The use of the X-ray as an aid to diagnosis in cases of fracture or other indicated cases is a matter of common knowledge, and the failure to make use thereof in such a case amounts to a failure to use that degree of care and diligence ordinarily used by physicians of good standing practicing in this community. The court in the absence of expert testimony may take judicial notice of this fact. [Citing cases.]

"It is evident in the present case that when plaintiff fell a possible fracture was indicated, and under the foregoing rules it is likewise apparent that it was a matter of common knowledge, of which the trial court should have taken judicial notice that the ordinary physician of good standing in this

community, in the exercise of ordinary care and diligence, would have had X-ray pictures taken of plaintiff's body when a fracture might have resulted from the fall. In failing to do so defendant did not exercise the degree of learning and skill ordinarily possessed by physicians of good standing practicing in this community. Defendant Larson thus failed to use ordinary care and diligence in his treatment of plaintiff, with the result that plaintiff suffered personal injury. Therefore, the evidence which plaintiff introduced before the trial court established a prima facie case and it was error to grant defendant's motion for a nonsuit.'' (See also *McBride* v. *Saylin*, 6 Cal.2d 134 [56 P.2d 941]; *Reynolds* v. *Struble*, 128 Cal.App. 716 [18 P.2d 690]; *Rankin* v. *Mills*, 207 Cal. 438 [278 P. 1044]; *Agnew* v. *City of Los Angeles*, 97 Cal.App.2d 557 [218 P.2d 66]; *McCollum* v. *Barr*, 38 Cal. App. 411 [176 P. 463].)

Of course, failure to take X-rays of a fractured limb does not constitute negligence under all circumstances. (*Bickford* v. *Lawson*, 27 Cal.App.2d 416 [81 P.2d 216]; *Lawless* v. *Calaway*, 24 Cal.2d 81 [147 P.2d 604].) Thus, in the present case, if the testimony produced by defendant is believed, we have a man who, by reason of prior illness, had a weakness in the extremities on the left side who falls on his buttocks. Thereafter, he complains to all the doctors, including defendant, of pain in the knee area, and never complains of pain in the hip. There were physical evidences of injury to the knee. X-rays are taken of the knee. There was no evidence of injury to the hip. To say the least, under those circumstances, it was a matter for expert evidence, as to whether an X-ray should have been taken of the hip. But the difficulty with the challenged instructions is that they told the jury to disregard completely the evidence of plaintiff and his wife on the issue of whether the defendant had exercised due care. ▮ According to that testimony, plaintiff consistently told defendant that he was in great pain, not in the knee but above the knee and up the leg to the hip, but defendant scoffed at the complaints, stating that the condition was mental, and even refused and failed to inspect the injured area. The plaintiff's evidence is that, had such an examination been made, it would have disclosed the unmistakable physical evidences of a hip fracture. One does not have to be a doctor to know that, if this evidence is believed, due care was not exercised. According to the cases above

cited, such facts proved a prima facie case and are sufficient to sustain a verdict for the plaintiff. But by the instructions the jury was told to ignore all of this evidence and to consider only that of the experts. This was prejudicial error. (For cases closely in point see *Byrom* v. *Eastern Dispensary & Cas. Hospital,* 136 F.2d 278 [78 App.D.C. 42]; *Cornwell* v. *Sleicher,* 119 Wash. 573 [205 P. 1059].)

Defendant argues that the challenged instruction did not tell the jury to ignore plaintiff's evidence, or that negligence could only be proved by experts, but merely told the jury that the standard of care must be established by expert testimony, and that, once that standard is established, then the jury could consider all of the evidence in the case to determine whether that standard had been followed. ■ Here, under plaintiff's evidence, he was entitled to an instruction to the effect that if the jury found the facts in accordance with plaintiff's evidence, then the court takes judicial notice that due care required that an X-ray should have been taken of the hip. An instruction to that general effect was offered by plaintiff but refused by the court. Moreover, the jury was told to disregard plaintiff's evidence. The jury was told that "The testimony of lay witnesses in this case, including the plaintiff, who are not members of the medical profession, *is not to be and cannot be considered by you upon any question relating to the skill and care,* or want of it, possessed and *exercised by the defendant.*" (Italics added.) This was clearly prejudicial.

The prejudicial nature of the instruction is not changed by the fact that plaintiff produced an expert to testify on the standard of care. If the evidence of plaintiff is to be believed, the fact that due care was not exercised is a matter of common and judicial knowledge. Although expert evidence was offered as to such fact, it did not make that fact any less a fact of common or judicial knowledge.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied March 21, 1956, and respondent's petition for a hearing by the Supreme Court was denied April 18, 1956.