[No. C013128. Third Dist. Sept. 30, 1993.]

BETTY L. GANNON, Plaintiff and Appellant, v.
WILLIAM A. ELLIOT, Defendant and Respondent.

**COUNSEL**

Beeman & Beeman and Paul L. Beeman for Plaintiff and Appellant.

Donahue & Callaham, Donahue, Lambert & Wood, Barry A. Vogel and Stephen J. Mackey for Defendant and Respondent.

## OPINION

**DAVIS, J.**—In this medical malpractice action involving a foreign object left in plaintiff's right hip following surgery, plaintiff appeals from a judgment in favor of the surgeon, William A. Elliot, M.D. Plaintiff claims the trial court erred prejudicially when it foreclosed the jurors from using their common knowledge in evaluating the question of negligence. We agree and reverse the judgment.

## BACKGROUND

Plaintiff fell and broke her right hip on December 22, 1987. The next day, defendant performed a partial right hip joint replacement on her. Plaintiff was 65 years old at the time. During the course of the operation, a gray rubber or plastic cap from a surgical instrument—measuring approximately three centimeters by one centimeter—was left in plaintiff's hip socket (known as the acetabulum).

Throughout 1988 and early 1989, plaintiff complained of continued pain in her right hip and limited mobility. Plaintiff sought further medical treatment and on May 1, 1989, had Dr. Thomas Voegeli perform a total right hip joint replacement. During that procedure, Dr. Voegeli found what he described as a "large foreign body" (the gray rubber cap) in plaintiff's right hip socket (acetabulum).

The difference between a total hip joint replacement and a partial one is that the natural hip socket is left intact in the partial procedure. Dr. Voegeli could not say whether plaintiff's pain following her first operation was caused by the foreign object or by the natural hip socket wearing out. Within a month of this second operation, however, plaintiff had no pain and was not on any medication. Within six months, she was ambulating normally without any aids or medication and without any pain.

Dr. Voegeli had been a residency student under defendant and considered him a friend. Dr. Voegeli concluded it was not malpractice for this particular foreign object to be in plaintiff's hip socket, although he noted that "[w]e all have different definitions" of what constitutes malpractice.

The plaintiff's expert, Dr. John Chase, disagreed with this assessment from Dr. Voegeli. Dr. Chase opined that defendant's performance fell below the standard of care because the foreign object was "of certainly adequate size to not only be seen but also to be felt."

The defendant's expert, Dr. Keith Swanson, concluded that defendant met the standard of care because it was so unusual for the surgical instrument cap

to be in the field of the actual surgery that a doctor would have no reason to suspect it being in the surgical wound. Normally, the surgeon in this type of operation is looking and feeling for rough debris like bone and cement. This cap, however, was smooth and may have felt like cartilage. Dr. Swanson concluded this was a case of "just bad luck" rather than negligence.

Defendant and a colleague who assisted him on plaintiff's first surgery, Dr. Roland Dutton, both testified along lines similar to Dr. Swanson, although defendant conceded it was improper and a mistake for him to have left the cap inside of plaintiff.

It was undisputed that the standard of care in plaintiff's operation requires a visual and a digital exploration of the hip socket to clear it of debris prior to setting it in place. It was also undisputed that leaving a sponge or a needle in a surgical patient would fall below the standard of care. The jury returned a verdict of nine to two in favor of defendant with the twelfth juror "on the fence."

DISCUSSION

This case was tried on a theory of res ipsa loquitur. The trial court instructed the jury, over plaintiff's objection, with BAJI Nos. 6.30, 6.35 and 4.02 in pertinent part as follows:

No. 6.30: "You must determine the standard of professional learning, skill and care required of the defendant only from the opinions of the physicians including the defendant who have testified as expert witnesses as to such standard. . . ."

No. 6.35: "You must decide the following questions concerning the injury involved in this case: [¶] Is it the kind of injury which ordinarily does not occur in the absence of negligence? [¶] Whether the injury was one which ordinarily does not occur in the absence of negligence is to be determined from the evidence presented in this trial by physicians and surgeons called as expert witnesses. . . . [¶] If, and only if, you find that the plaintiff's injury was of a kind which ordinarily does not occur in the absence of negligence; that it was caused while the plaintiff was exclusively under the care or control of defendant; and that it was not due to any voluntary action or contribution by the plaintiff which was the legal cause of the injury you are instructed as follows: [BAJI No. 4.02.]"

No. 4.02: "From the happening of the injury involved in this case, you may draw an inference that a legal cause of the occurrence was some

negligent conduct on the part of the defendant. [¶] However, you shall not find that a legal cause of the occurrence was some negligent conduct on the part of the defendant unless you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant."

██ Plaintiff contends that BAJI No. 6.30 and the third paragraph of BAJI No. 6.35—which is optional—should not have been given here because they foreclosed the jurors from relying on their common knowledge in determining the standard of care and whether defendant met that standard. Plaintiff also claims that BAJI No. 4.03—which instructs the jury to presume there was negligence—should have been given instead of No. 4.02, which permits only an inference of negligence. We find merit in plaintiff's contention regarding BAJI Nos. 6.30 and 6.35.

██ "Res ipsa loquitur applies where the occurrence of an injury is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that defendant probably is the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied on both expert testimony and common knowledge. . . . ██ Ordinarily, the standard of care required of a doctor, and whether he exercised such care, can be established only by the testimony of experts in the field." (*Hurn* v. *Woods* (1982) 132 Cal.App.3d 896, 901 [183 Cal.Rptr. 495], citations omitted.) "But to that rule there is an exception that is as well settled as the rule itself, and that is where 'negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact.'" (*Friedman* v. *Dresel* (1956) 139 Cal.App.2d 333, 341 [293 P.2d 488], quoting *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 86 [147 P.2d 604].) Under the doctrine of res ipsa loquitur and this common knowledge exception, it is proper to instruct the jury that it can infer negligence from the happening of the accident itself, if it finds based on common knowledge, the testimony of physicians called as expert witnesses, and all the circumstances, that the injury was more likely than not the result of negligence. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 784, 793 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].)

Cases in which a foreign object has been left in the patient's body during an operation fall within this common knowledge application of the res ipsa doctrine. (See *Ales* v. *Ryan* (1936) 8 Cal.2d 82 [64 P.2d 409] [sponge left in abdominal cavity]; *Armstrong* v. *Wallace* (1935) 8 Cal.App.2d 429 [47 P.2d

740] [same]; *Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509 [305 P.2d 36] [clamp left in abdomen]; see also Dahlquist, *Common Knowledge in Medical Malpractice Litigation: A Diagnosis and Prescription* (1983) 14 Pacific L.J. 133, 136-142 [hereafter, Dahlquist, *Common Knowledge*]; 141 A.L.R. 24; 81 A.L.R.2d 641-645.) In fact, it has been noted that these cases "constitute the most widely recognized category of common knowledge cases." (Dahlquist, *Common Knowledge*, at p. 138.)

California decisions state that the common knowledge exception applies if the medical facts are commonly susceptible of comprehension by a lay juror—that is, if the jury is capable of appreciating and evaluating the significance of a particular medical event. (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 236 [104 Cal.Rptr. 505, 502 P.2d 1]; *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 141 [181 Cal.Rptr. 732, 642 P.2d 792].) As our high court has succinctly put it: "Technical knowledge is not requisite to conclude that complications from . . . a surgical clamp left in the patient's body . . . indicate negligence. Common sense is enough to make that evaluation." (31 Cal.3d at p. 141.)

 In applying this principle to the facts here, we conclude the trial court erred by instructing the jurors with BAJI No. 6.30 and the third paragraph of BAJI No. 6.35; these instructions told the jurors they could rely only on expert testimony in determining the issue of negligence.

Admittedly, the foreign object left in plaintiff's body was neither as large nor as directly related to the surgical procedure as the sponges, clamps, and gauze pads at issue in many common knowledge cases. The object at issue here—the gray rubber surgical cap, which is part of the appellate record—measured approximately 3 centimeters by 1 centimeter. Nonetheless, the cap is at least as large as a surgical needle, and there is little question a layperson can apply his or her common knowledge to a surgical needle left in a patient. (See 81 A.L.R.2d 641, § 6.) Moreover, the size of the cap relative to the area of the surgery—the right hip socket—shows the cap to be of significant size. Indeed, Dr. Voegeli's postoperative record describes the cap as a "large foreign body."

Nor does the fact that the cap is an unusual item in the area of the surgical wound render the common knowledge exception inapplicable. The defendant argues that he was not looking or feeling for such an unusual object. But there was evidence that the cap was to a surgical instrument. In any event, it seems equally reasonable that a layperson could ask what the cap was doing near the surgical wound in the first place or why the surgery was being done with a capped instrument.

One foreign object case in California has limited the jury to expert testimony regarding the standard of care. In *Landsberg* v. *Kolodny* (1956) 145 Cal.App.2d 158 [302 P.2d 86], the plaintiff, during childbirth, suffered a life-threatening hemorrhage. After medicinal and other procedures failed to stop the profuse bleeding, the defendant doctor packed the uterus with a five-yard roll of gauze and the vagina with a three-yard roll and the hemorrhage stopped. A mesh of this gauze became embedded in plaintiff's abdomen and plaintiff later sued the doctor. The court in *Landsberg* approved instructions limiting the jurors to the expert testimony on the standard of care. (145 Cal.App.2d at p. 162.)

*Landsberg* is distinguishable from the case before us. In *Landsberg*, there was a life-threatening emergency that failed to respond to conventional treatment. Drastic measures were called for and were taken. No comparable medical facts exist in the present case.[1]

On appeal, defendant deflects the question of whether the common knowledge exception applies here by repeatedly noting that of the five doctors who testified in this case, four concluded he was within the standard of care. However, we are not as mesmerized by this "four out of five doctors" claim. While this may constitute potent evidence to rebut an inference of negligence under the res ipsa doctrine, it does not diminish the conclusion that the professional significance of a three-centimeter by one-centimeter surgical instrument cap left in or near a patient's hip socket during a hip socket operation is within the comprehension of laypersons. (See *Franz* v. *Board of Medical Quality Assurance*, *supra*, 31 Cal.3d at p. 141.)

The critical point in this appeal is not how many doctors agree with defendant, but whether the jury is limited *solely* to the expert testimony of doctors in evaluating this case. We have concluded the jurors are not limited in this way. As the use note and comment to BAJI No. 6.30 state, "[i]f the standard of care is a matter of common knowledge, this instruction should not be given," and "[e]xamples of adequacy of common knowledge to establish negligence" include "[f]oreign object left in body after operation." (BAJI No. 6.30 (7th ed.) pp. 205-207.) As one commentator has put it, "Judges and juries in these cases are able to decide the negligence issue without the assistance of expert testimony because it is assumed that everyone knows 'it is not the practice in the community for competent surgeons to leave a sponge [or other foreign object] in the operative wound following an open operation.'" (Dahlquist, *Common Knowledge*, *supra*, 14 Pacific L.J. at p. 138, brackets in original.) In line with this premise, the use note to BAJI

---

[1]Our research shows that *Landsberg* has never been cited in any published California decision, appearing only in American Law Reports annotations over its 37-year lifespan.

No. 6.35 says to "[i]nclude [the] third paragraph [of the instruction] when expert testimony is necessary to determine whether a probability of negligence appears from the happening of the injury." (BAJI (7th ed.) p. 209.)

We conclude the trial court erred in instructing with BAJI No. 6.30 and the third paragraph of BAJI No. 6.35, which foreclosed the jurors from using their common knowledge in evaluating the question of negligence here. The issue, then, is whether this error was prejudicial. We conclude it was.

█ "While there is no precise formula for measuring the effect of an erroneous instruction . . . , a number of factors are considered in measuring prejudice: (1) the degree of conflict in the evidence on critical issues . . . ; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect . . . ; (3) whether the jury requested a rereading of the erroneous instruction . . . or of related evidence . . . ; (4) the closeness of the jury's verdict . . . ; and (5) the effect of other instructions in remedying the error. . . ." (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946], citations omitted.) The question is whether a review of the evidence in light of these factors "establishes the probability that the erroneous instruction may have misled the jury." (*Ibid.*; see also *Tomei* v. *Henning* (1967) 67 Cal.2d 319, 323-324 [62 Cal.Rptr. 9, 43 P.2d 633].) We conclude the erroneous instructions were misleading here.

█ As in *LeMons*, "[t]he evidence was sharply conflicting on the critical issue of whether Dr. [Elliot's] conduct was within the community standard of medical practice. The jury may have found either that (1) Dr. [Elliot] was not negligent or (2) he was negligent. . . ." (21 Cal.3d at p. 876.) All of this evidence came from the five doctors who testified as expert witnesses in this case, and the jury was limited only to that evidence. Of these five doctors, one was plaintiff's expert, one was defendant's expert, two were the actual surgeons in the operation at issue, and the fifth considered defendant a friend.

In argument, defendant's counsel focused on these divergent opinions and reiterated that the jury was limited to them in determining whether defendant was negligent. After emphasizing the importance of the instructions, the defendant's counsel told the jurors: "You are instructed, you must determine the standard of professional learning, skill and care required of the defendant only from the opinions of the physicians, including the defendant, Dr. Elliot, who have testified as expert witnesses as to such standards."

The verdict was as close as it could be, with nine jurors in defendant's camp. The fact that it was reached with the minimum of margins further

supports the probability that the erroneous instructions were significant. (*LeMons, supra,* 21 Cal.3d at p. 877; *Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

No other instructions remedied this mistake. The jury was limited to the expert testimony on what the standard of care was and whether defendant met it. Ironically, evidence on common knowledge was admitted at trial. Plaintiff's attorney questioned Dr. Chase as follows:

Q. . . . Doctor, would you agree that common sense and common knowledge would tell you that that cap should not have been left in Betty Gannon's—

"MR. VOGEL [defense counsel]: Irrelevant.

"MR. BEEMAN [plaintiff's counsel]: It's not irrelevant.

"MR. VOGEL: Well—

"THE COURT: Just a moment. Please complete the question. BY MR. BEEMAN:

"Q. Would you agree that common sense and common knowledge should tell you that to leave that cap inside of Betty Gannon's hip socket was negligence?

"MR. VOGEL: I will withdraw the objection.

"THE WITNESS: Yes. I agree."

And Dr. Swanson agreed with plaintiff's attorney that "[c]ommon sense would tell you that [the] cap does not belong inside somebody's acetabulum at the time of the final reduction."

Finally, the fact that plaintiff had an expert witness support her theory does not cure the erroneous instructions. The point of a case with a common knowledge element is that the jury can rely on its common knowledge. (See *Bardessono* v. *Michels, supra,* 3 Cal.3d at pp. 784, 793.) But the instructions here told the jury to ignore common knowledge and to consider only what the experts had said. A similar situation was presented in *Friedman* v. *Dresel, supra,* 139 Cal.App.2d at pages 343-344, and there the court found prejudicial error. This is not to discount the expert testimony favorable to defendant. Instead, our resolution simply recognizes that the jury can use common knowledge or expert testimony, or both, to determine the standard

of care, whether defendant met that standard, and whether the injury is one which ordinarily does not occur in the absence of negligence.

 We conclude the trial court erred prejudicially by instructing with BAJI No. 6.30 and the third paragraph of BAJI No. 6.35.[2] In light of our disposition, we need not reach plaintiff's claim of juror misconduct.

## DISPOSITION

The judgment is reversed. Plaintiff is awarded her costs on appeal.

Sims, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied October 28, 1993, and respondent's petition for review by the Supreme Court was denied January 19, 1994.

---

[2]We disagree, however, with plaintiff's claim that the trial court erred by instructing with BAJI No. 4.02—which permits an inference of negligence under the res ipsa doctrine—rather than with BAJI No. 4.03, which sets forth a presumption of negligence. If the evidence is sufficient to conclude that defendant was not negligent, as is the case here, BAJI No. 4.03 is not to be given. (See Use Notes to BAJI Nos. 4.02 and 4.03.)