Filed 10/21/14  P. v. Quintana CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ISIDRO SANCHEZ QUINTANA,<br><br>    Defendant and Appellant. | H038900<br>(Santa Cruz County<br>Super. Ct. No. F22486) |

Defendant Isidro Sanchez Quintana was convicted by a jury of one count of possession of methamphetamine for sale (Health & Saf. Code, § 11378, count 1) and one count of possession of ammunition by a prohibited person (Pen. Code, § 30305, subd. (a)(1), count 2).[1]  He was sentenced to a two year term on count 1 (16 months in jail plus eight months on community release) and a consecutive 30 day term on count 2.  The trial court awarded him a total of 276 days of credits consisting of 138 days of custody credit and 138 days of conduct credit, and imposed various fines and fees.

On appeal, Quintana raises a multitude of claims, including claims of instructional error, ineffective assistance of counsel and error in admitting certain evidence.  He also challenges an AIDS education fine (§ 1463.23) which was not part of the court's oral pronouncement at sentencing and further notes that the sentencing order fails to provide him all the credits he was awarded.  We disagree with all of these contentions with the exception of the AIDS education fine and the credits issue.  Accordingly, we will direct

---

[1] Further unspecified statutory references are to the Penal Code.

the trial court to modify the sentencing order to correct these errors. As modified, we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the morning of March 25, 2012, Watsonville police officers executed a search warrant for the garage of a residence located at 157 Manana Lane. Quintana came to the garage door and admitted the officers. Inside the two-car garage, there was plastic sheeting hanging from the ceiling to create a partitioned area which contained a bed and various other furnishings, including a working television and refrigerator, as well as a propane grill.

When police entered the garage, a woman, Melissa Lara, was sleeping on the bed. Lara was cooperative and, because she did not appear to be under the influence of drugs and disavowed being involved with drugs, was released.

In a closed dresser drawer near the foot of the bed, police found a white pill bottle containing four small red plastic bindles. The bindles were heat-sealed and contained a white crystalline substance, later determined to be methamphetamine. Each bindle had a gross weight of 0.3 grams. A police officer testified, based on his training and experience, that each bindle would sell for $20 or $30.

In the top drawer of a nightstand next to the bed police found a glass pipe with a black residue at the bottom, indicating it had been used to smoke methamphetamine. Next to the pipe was a wallet containing Quintana's identification as well as a total of $103 in assorted bills. A cell phone was charging on top of the nightstand.

Police also found two plastic baggies next to the television which were empty except for small flakes of methamphetamine residue. In the same area, there were two pieces of plastic, one red and one green, which had been cut or stretched. The red plastic was the same color and texture as the plastic used to form the bindles of methamphetamine found inside the white pill bottle.

2

Near the television was a working digital scale, approximately four inches by five inches in size, with white crystals around the edge of the weighing surface. Inside a candleholder to the right of the television, police found four .22-caliber bullets.

Hanging on a wall, police found a keyring which had a key to the garage door, a key to Quintana's vehicle, a bullet that had been modified into a sort of charm, a handcuff key, a laser pointer and a silver dollar. Quintana's vehicle, which was registered at a different address, was parked outside. An officer testified he often drove past the garage while on daily patrol and had seen Quintana's vehicle parked there three to five times. The vehicle was searched, but police discovered nothing illegal inside it.

When asked about the cell phone, Quintana admitted it was his. A photo of Quintana and Lara lying on a bed was displayed on the phone, along with the name "Shorty." The police also looked at incoming and outgoing text messages on the phone from March 24 and March 25, 2012. Multiple messages requested drugs, using terms such as "candy," "a dime," "a 20," "a sack," and "a gram."[2]

After Quintana was arrested, he was questioned at the police department. He denied living at the garage and at first said he did not have a key to it. When told that one of the keys on the keychain fit the lock on the door to the garage, he admitted the key was his. He could not explain why his vehicle had been seen parked at the garage several times that week. Police asked him about the various items they found in the garage and Quintana admitted that the cell phone and the wallet belonged to him, although he denied that the drugs and drug paraphernalia were his. Quintana said other people lived in the

---

[2] Prior to trial, Quintana brought an in limine motion seeking to exclude these text messages as hearsay, among other reasons. The trial court denied the motion, finding the messages were not barred by the hearsay rule because many of them were questions and offers to purchase controlled substances thus constituting circumstantial evidence that the methamphetamine found in the garage was possessed for sale. The messages are set forth in detail, *ante*, in section II.C.

garage, but could not provide any names. He said he was homeless and lived at other places, but could not give any addresses.

When asked about the meaning of the term "candy" used in one of the text messages on his phone, Quintana said he sold candy to make money, buying bags for $2.98 and reselling them for $5.

Watsonville Police Officer Ed Delfin testified that, in his opinion, the bindles of methamphetamine found in the garage were for sale, not for personal use. His opinion was based on the number of bindles found, along with the packaging materials, the digital scale, the cash in Quintana's wallet as well as the many text messages referring to drug sales by common euphemisms. According to Officer Delfin, Quintana ran a "low-level operation, street level," since he had small quantities of drugs on hand for sale but also appeared to be a user who was likely selling drugs to support his habit.

Jose Hinojosa, who lived by himself in the house above the garage, testified his late father was friends with Quintana, and allowed him to live in the garage. Hinojosa did not know Quintana well, but knew him by his nickname, "Shorty."

The jury found Quintana guilty on the charge of possession of methamphetamine for sale (Health & Saf. Code, § 11378) and unlawful possession of ammunition (§ 30305, subd. (a)(1)).[3]

Quintana was sentenced to two years on the charge of possession for sale, with 16 months to be served in county jail followed by eight months on community release. On the ammunition charge, the trial court imposed a consecutive sentence of 30 days in county jail. The trial court awarded a total of 276 days of credits, consisting of 138 days of custody credit and 138 days of conduct credit, and imposed various fines and fees.

---

[3] A third charge of petty theft of lost property (§ 485, count 3) was not submitted to the jury and was subsequently dismissed.

## II. DISCUSSION

### A. *Failure to discharge jury panel*

Quintana's first claim of error is that his trial counsel was ineffective for failing to move to discharge the jury panel after a prospective juror tainted it with her "expert-like" pronouncements regarding Quintana's guilt.

#### 1. *Factual background*

During jury selection, prospective Juror L.L. was among the first group of jurors called for voir dire. L.L. said she has been a drug and alcohol counselor at a rehabilitation facility for nearly eight years and is herself a recovering addict. When asked by the trial court if she could be fair and vote not guilty if the prosecution failed to meet its burden of proof, L.L. responded, "Yeah. Um. It is my opinion, though, right now that if he was in a dwelling that had methamphetamine in it, that that would be a sign that there--that he has a part in it." The trial judge followed up by posing the following hypothetical, "But if there are 25 people who lived in the same residence and none of them knew Mr. Quintana and there wasn't any evidence that he had been there before or lived there, you'd probably vote not guilty, wouldn't you?" After initially not responding, L.L. said, "Well, just based on what I do and what I hear, if somebody is in a house and there's methamphetamine, the likelihood that they don't know that that is going on is not probable." The trial judge again reiterated, "The People have to prove it, and if they don't prove it, you have to vote not guilty. Are you able to do that?" to which L.L. responded, "I can try." When the trial judge subsequently asked the prospective jurors collectively to raise their hands if they felt they could be a fair juror, L.L. raised her hand.

As defense counsel examined the prospective jurors, he asked L.L. what her verdict would be if she were asked to render it at that moment, and she responded, "I would tend--probably tend towards guilty at this point." Defense counsel asked her to explain her answer, and L.L. said, "I'm a recovering addict also, and just based on my

5

experience and what I hear and what I know from drug activity and associations with that, I would find it difficult to believe that he did not know that the methamphetamine was there or have any involvement with it." Defense counsel subsequently asked L.L. if this case would be difficult for her because of the allegations that Quintana was selling methamphetamine, and she said "I do have a prejudice against that, obviously, because of the work I do."

During the prosecutor's voir dire, she asked L.L. if she could be fair and impartial despite her work experience, and L.L. responded, "I don't know." The prosecutor asked what would get in the way, and L.L. said, "Just my experience with being an addict and living in that--that world, and the criminal activity, and hearing what people say to me all the time. I think that denial and minimizing are part of, you know, what happens when you get caught doing something."

At a subsequent sidebar, defense counsel advised the court he would challenge L.L. for cause and the trial court said, "You don't need to make a record. I will grant that."

### 2. Relevant legal standards

To prevail on a claim of ineffective assistance of counsel, the defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "[P]rejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Ibid.*, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*).) " ' "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors

[citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." ' " (*Ibid.*)

"[T]he trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire [panel] to such an extreme that its discharge is required." (*People v. Medina* (1990) 51 Cal.3d 870, 889 (*Medina*).) Furthermore, "[i]t is within the trial court's discretion to determine that a prospective juror's statement was not prejudicial and thereby deny a defendant's motion to dismiss the jury panel." (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 41.) "The conclusion of a trial judge on the question . . . is entitled to great deference and is reversed on appeal only upon a clear showing of abuse of discretion." (*People v. Martinez* (1991) 228 Cal.App.3d 1456, 1466.) "Just as a finder of fact is in a better position than the reviewing court to judge the credibility of a witness, the trial judge is in a better position to gauge the level of bias and prejudice created by juror comments." (*Ibid.*) Discharging an entire jury panel is a remedy reserved for "the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending [jurors] would be insufficient protection for the defendant." (*Medina*, *supra*, at p. 889.)

> ### 3. *Analysis*

Quintana cites a federal case, *Mach v. Stewart* (9th Cir. 1997) 137 F.3d 630, 633 (*Mach*) as persuasive authority to support his argument that his trial counsel was ineffective for failing to move for dismissal of the jury panel for cause. We are not persuaded *Mach* is applicable to the instant case.

In *Mach*, a prospective juror in a child sexual abuse prosecution was a social worker with the State of Arizona Child Protective Services. The juror indicated before the entire jury panel that she would have a difficult time being impartial in that "sexual assault had been confirmed in every case in which one of her clients reported such an assault." (*Mach*, *supra*, 137 F.3d at p. 632.) Further questioning established the juror

7

"had never, in three years in her position, become aware of a case in which a child had lied about being sexually assaulted." (*Ibid*.) The Ninth Circuit "presume[d]" the juror's comments "tainted" at least one juror, violating the defendant's right to an impartial jury. (*Id*. at p. 633.)

"Decisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352.) In addition, under California law there is no presumption of jury taint or prejudice arising from a prospective juror's remarks such as the Ninth Circuit applied in *Mach*. (See *Medina*, *supra*, 51 Cal.3d at p. 889 [trial court discretion to determine whether possible bias or prejudice contaminated entire venire. Drastic remedy of discharge not appropriate as matter of course where a few prospective jurors made inflammatory remarks].) We are bound to follow the principles enunciated by our state's highest court. (*Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455.)

Finally, *Mach* is distinguishable in at least two ways. First, in *Mach*, the trial court did not conduct further voir dire to determine whether the remainder of the panel had in fact been infected by the potential juror's statements. (*Mach*, *supra*, 137 F.3d at p. 633.) In this case, the trial court and counsel conducted further voir dire to determine whether other prospective jurors had in fact been infected by L.L.'s statements and all potential jurors who stated they may not be able to be impartial were excused from the jury panel. Second, the prospective juror's claim in *Mach* (i.e., children do not lie when making accusations of sexual assault) was more expansive than L.L.'s claim that if someone lives in a house where methamphetamine is found it is improbable they do not know about it.

Having examined the entirety of the jury selection proceedings, we conclude defense counsel was not ineffective for failing to move for dismissal of the jury panel. L.L. professed no individual knowledge of Quintana and simply opined that, in her experience with drug addicts, she would be inclined to find him guilty based only on the

allegations that methamphetamine was found in his dwelling. In addition, L.L.'s statements were directed only to Quintana's knowledge that there was methamphetamine in the dwelling, rather than that he was selling methamphetamine. The possibility that the jury panel was tainted by L.L.'s remarks into prejudging the question of whether Quintana was selling methamphetamine out of the garage was so remote that counsel was under no obligation to request discharge of the panel.

   *B. Instructional error regarding lesser included offense of simple possession*

   Quintana argues the trial court erred in instructing the jury it could not consider the lesser included offense of simple possession unless it first unanimously found him not guilty of the greater offense of possession for sale.

   *1. Factual background*

   Prior to the trial court reading the jury instructions aloud, written copies were distributed to the jurors.

   After instructing the jury on the elements of possession of methamphetamine with intent to sell, the court instructed that "simple possession of a controlled substance is a lesser included [offense] of possession with intent to sell a controlled substance. [¶] And I do want to share with you, you can find a defendant guilty of only one of these items, or you can find him not guilty of both, but if you find the defendant, for example, guilty of possession with intent to sell methamphetamine, you don't go on to consider the lesser included offense. *You only consider the lesser included offense if you have unanimously found him not guilty of possession with the intent to sell a controlled substance.*" (Italics added.)

   After reading instructions related to the charge of unlawful possession of ammunition, the court provided a "final instruction deal[ing] with how to consider Count 1, possession of methamphetamine for sale, and the lesser included of simple possession: [¶] If all of you find that the defendant is not guilty of any greater crime, you may find the defendant guilty of a lesser crime, if you are convinced beyond a reasonable doubt

9

that the defendant is guilty of a lesser crime. [¶] A defendant may not be convicted of both a greater crime and a lesser crime for the same conduct, and I'll explain to you which crimes are affected. [¶] Possession with the intent to sell methamphetamine, which is Health and Safety Code Section 11378, charged in Count 1, simple possession is a lesser included. [¶] . . . [¶] It's up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime."

### 2. Relevant legal standards

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.)  In deciding whether instructional error occurred, we "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918.)  In that context, we then "determine whether it is reasonably likely the jurors understood the instruction[s] as [defendant] suggests. [Citation.]  In making that determination, we must consider several factors including the language of the instruction[s] in question [citation], the record of the trial [citation], and the arguments of counsel." (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.)

"[T]he case law is clear that whether the giving of a concrete instruction is confusing or erroneous must be determined from the instructions as a whole. . . . 'Error cannot be predicated upon an isolated phrase, sentence or excerpt from the instructions since the correctness of an instruction is to be determined in its relation to other instructions and in the light of the instructions as a whole.  [Citations.]  Accordingly, whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court.' " (*People v. Patterson* (1979) 88 Cal.App.3d 742, 753.)  Even if we conclude that " 'a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury

10

misunderstood and misapplied the instruction.' " (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 589.)

Errors in jury instructions are reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman* (1998) 19 Cal.4th 142, 172-178.) Therefore, an error requires reversal only where "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Id*. at p. 165, citing *People v. Watson*, *supra*, at p. 836 & Cal. Const., art. VI, § 13.) " '[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson*." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.)

### 3. Analysis

It is clear in this case the trial court misspoke when it initially advised the jury that it could "only consider the lesser included offense if you have unanimously found [Quintana] not guilty of possession with the intent to sell a controlled substance." "[A] trial court should not tell the jury it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense." (*People v. Dennis* (1998) 17 Cal.4th 468, 536.) A trial court correctly guides a jury when it instructs the jury that it can *deliberate* in any order it wishes but must determine *guilt* in a certain order, specifically it must acquit of the greater offense before returning a verdict on a lesser included offense. (See *People v. Wharton* (1991) 53 Cal.3d 522, 573; *People v. Kurtzman* (1988) 46 Cal.3d 322, 336 (*Kurtzman*).)

Quintana cites *Kurtzman*, in which the jury sent out the following question during deliberations: " 'Can we find the defendant guilty of manslaughter without unanimously finding him not guilty of murder in the second degree?' " (*Kurtzman*, *supra*, 46 Cal.3d at p. 328.) The trial court responded, " 'No, you must unanimously agree on the second degree murder offense before *considering* voluntary manslaughter.' " (*Ibid*.) The California Supreme Court held that this response was erroneous. A jury "may consider

11

charges in any order it wishes to facilitate ultimate agreement on a conviction or acquittal," even though "it may not return a verdict on lesser offenses unless it has unanimously agreed on a disposition of the greater." (*Id*. at p. 332.)

Unlike *Kurtzman*, the erroneous instruction in this case was not given in response to a question from the jury during deliberations, in which the impact of the error was undoubtedly magnified. Instead, the trial court first erroneously told the jury it could only consider the lesser included offense of simple possession if it unanimously found Quintana not guilty of possession with intent to sell. It subsequently correctly told the jury that it could deliberate on the greater and lesser offenses in any order it chose, but that it could not return a verdict of guilty on the lesser included offense unless and until it acquitted Quintana on the greater. Furthermore, the jurors were given copies of the correct instruction (CALCRIM No. 3517) to take into the jury room during deliberations.

Looking at the instructions as whole, there is no probability, let alone a reasonable probability, that the jurors misunderstood their task in considering the greater and lesser included offenses in this case. To the extent there could have been any initial confusion about their ability to consider those offenses in any order they desired, that was remedied by the trial court subsequently providing the correct instruction to them both orally and in writing.

Here, even if the trial court erred under *Kurtzman*, the error was harmless. It is not reasonably probable the jury would have convicted Quintana of simple possession rather than possession for sale if the trial court had not made its initial misstatement about not considering the lesser offense unless it first acquitted on the greater. Again though, the trial court expressly instructed the jury with CALCRIM No. 3517, both orally and in writing, which informed the jurors they could decide the order in which they considered each crime. On this record, it is not reasonably probable that the jury was misled by the trial court's initial advisement such that absent the error a different result would have occurred. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

12

C.     *Admission of text messages*

Quintana next claims the court abused its discretion in admitting, over defense objection, the hearsay text messages in which unknown persons were allegedly seeking to purchase drugs from him.  He contends the messages contain implied assertions that he possessed drugs for sale.  The messages at issue were, as follows:

"Can u hook up a 20."  (*Sic.*)

"Hey someone needs some candy u got sone."  (*Sic.*)

"U have some???"  (*Sic.*)

"Shorty as a friend im asking u if u can help me out i have court comming up soon i need to pay them 100 dollars i want to pay the in paymens like 40 or 60 bucks.  Can u hook me up a gram and i can sell real quick and ill have the money to pay my fine to the courts."  (*Sic.*)

"Can u hook up a 20 hook up the good stuff k."  (*Sic.*)

"Shorty its me deidra i only have 11 bucks can u hook me up a sack."  (*Sic.*)

"Hey do you want to sell me a dime--Tasha."

"D.D. i got new shoes bad real bad shoesss hit me up im home."  (*Sic.*)

"U got new shoes what about me where are my shoes im joking do u have anything cuz someone wants a 20."  (*Sic.*)

"yes wen i said shoes that means o just cum ? is mucho good."  (*Sic.*)

"yes i call u a block away."  (*Sic.*)

"Soy deidra can u hook up a 20 im on Lincoln street can u bring it to me over here."  (*Sic.*)

"Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence."  (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

Quintana acknowledges that several cases, including *People v. Jurado* (2006) 38 Cal.4th 72 (*Jurado*) and *People v. Nealy* (1991) 228 Cal.App.3d 447 hold that requests,

13

including requests to purchase drugs, do not constitute hearsay. He also cites *People v. Morgan* (2005) 125 Cal.App.4th 935 for the proposition that such requests are hearsay, but are excepted from the hearsay rule as nonassertive statements. Despite the weight of authority in favor of admitting these text messages, Quintana argues these cases are all wrongly decided and urges us to ignore them. Even were we inclined to disagree with the decisions issued by our sister Courts of Appeal in *Nealy* and *Morgan*, we are bound by the California Supreme Court's decision in *Jurado*. (*Auto Equity Sales*, *Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.)

In *Jurado*, the California Supreme Court rejected the defendant's argument that an out-of-court statement by an alleged accomplice to a third party asking "if he could get her a 'gat' (a slang term for a gun) . . . [because] she had a problem she needed to take care of" should have been excluded as hearsay. (*Jurado*, *supra*, 38 Cal.4th at p. 84.) The Court stated, "The request for the gun, by itself, was not hearsay, however, because an out-of-court statement is hearsay only when it is 'offered to prove the truth of the matter stated.' (Evid. Code, § 1200.) Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated." (*Id.* at p. 117.)

Because the text messages consisted, almost exclusively, of requests to purchase narcotics, those requests were not barred by the hearsay rule and the trial court did not abuse its discretion in admitting them into evidence.

D.      *Failure to instruct on treatment of Quintana's out-of-court statements*

Quintana argues the trial court failed to instruct the jury that his out-of-court statements should be considered with caution, even though the recording of those statements was not played to the jury.

1.      *Factual background*

During trial, a police officer testified that Quintana admitted during a recorded police interview that the cell phone found on the nightstand belonged to him. After both sides rested, the trial court instructed the jury pursuant to a modified version of

14

CALCRIM No. 358: "You have heard evidence that the defendant made an oral statement before the trial. You must decide whether the defendant made any such statement in whole or in part. If you decide the defendant made such a statement, consider the statement, along with all of the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement."

During the jury instruction conference, however, the prosecution requested that the last part of CALCRIM No. 358 be deleted. Accordingly, the jury was not read this part of the standard instruction: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded." (CALCRIM No. 358.) The prosecutor pointed out that Quintana's interview had been recorded and thus this part of the instruction was superfluous. Defense counsel agreed that this part of the instruction could be deleted.

        2.     *Standard of review*

Again, we review claims of instructional error "assum[ing] that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills*, *supra*, 1 Cal.App.4th at p. 918.) We ask whether it is "reasonably likely the jurors understood the instruction[s] as [defendant] suggests." (*People v. Nem*, *supra*, 114 Cal.App.4th at p. 165.)

Where a defendant's out-of-court statements are admitted, the court must instruct the jury that this evidence must be viewed with caution. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.) However, because the purpose of the cautionary instruction is to assist the jury in determining whether the statement was made, it may be omitted where the statement was recorded and that recording was played for the jury. (*Ibid.*)

        3.     *Analysis*

We are not persuaded that the omission of the cautionary language was error. The purpose of the cautionary instruction is to provide the jury with guidance in making the determination that the defendant in fact made the statement at issue. (*People v.*

15

*Slaughter*, *supra*, 27 Cal.4th at p. 1200.) Since there was no dispute that Quintana made the statement, there was no basis for giving the instruction to the jury in the first place.

Furthermore, even if the cautionary language should have been read to the jury, it is not reasonably likely the jury would have discounted Quintana's admission. Even without that admission to police, there was ample evidence supporting the conclusion that the cell phone belonged to him. The cell phone was charging on the nightstand in the garage where Quintana was residing. His picture appeared on the phone's screen, along with his nickname "Shorty," and at least two text messages addressed to "Shorty" were sent to that cell phone.

Consequently, the trial court did not err in deleting the cautionary language from CALCRIM No. 358.

E.     *Jury instructions regarding evaluation of circumstantial evidence*

Quintana next challenges his conviction for possession of ammunition based on the trial court's decision to instruct the jury with CALCRIM No. 225 rather than CALCRIM No. 224 regarding the proper evaluation of circumstantial evidence. Quintana contends the trial court had a sua sponte duty to instruct with CALCRIM No. 224 regarding circumstantial evidence to prove the charge of unlawful possession of ammunition because the necessary elements of that offense were supported principally, if not exclusively, by circumstantial evidence.

1.     *Factual background*

At trial, police officers testified that, while searching the garage, they discovered four .22-caliber bullets in a candle holder located to the right of the television. Quintana did not admit the ammunition was his. To prove that Quintana unlawfully possessed these bullets, the People had to prove: (1) Quintana had the ammunition under his

16

custody or control; and (2) Quintana knew he had the ammunition under his custody or control.[4]

At the jury instructions conference, the following colloquy took place:

"[COURT]: [The prosecutor] has proffered to me [CALCRIM No.] 224. [¶] It appears to the Court that [CALCRIM No.] 225 is the more appropriate circumstantial evidence add-on. [¶] Isn't the circumstantial evidence--doesn't it go to intent to sell?

"[PROSECUTOR]: It does.

"[COURT]: And would that not be [CALCRIM No.] 225, intent or mental state?

"[PROSECUTOR]: Yes.

"[COURT]: All right. [¶] Do you agree, [defense counsel]? [¶] I'll just point out the use notes tell us you give either [CALCRIM No.] 224 or 225. You don't give both.

"[DEFENSE]: I agree [CALCRIM No.] 225 seems appropriate.

"[COURT]: Okay. . . . [¶] So, [prosecutor], you will bring me [CALCRIM No.] 225, and we'll substitute that in and not give [CALCRIM No.] 224."

### 2. Relevant legal principles

A trial court is required to instruct the jury, sua sponte, on the general principles of law relevant to the issues raised by the evidence. (*People v. Martinez* (2010) 47 Cal.4th 911, 953; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171.) We determine the correctness of jury instructions from the entire charge of the court, rather than by judging an instruction or portion of an instruction in artificial isolation. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

CALCRIM Nos. 224 and 225 both instruct the jury on the proper use of circumstantial evidence. (*People v. Yeoman* (2003) 31 Cal.4th 93, 142; *People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1172.) CALCRIM No. 225 "informs the jury

---

[4] The parties stipulated that Quintana had previously been convicted of a misdemeanor.

on how to consider circumstantial evidence when only the element of mental state or intent has been proven by such evidence." (*People v. Samaniego*, *supra*, at p. 1171, fn. 12.) Thus, CALCRIM No. 225 is to be used in place of CALCRIM No. 224 " 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.' " (*People v. Samaniego*, *supra*, at p. 1171; *People v. Honig* (1996) 48 Cal.App.4th 289, 341 [CALJIC No. 2.02].) Both instructions "provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive." (*People v. Samaniego*, *supra*, at p. 1172; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142.)

"An instruction on the principles contained in [CALCRIM No. 224] 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 885 (*Rogers*).) "[B]ut it should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence." (*People v. Heishman* (1988) 45 Cal.3d 147, 167 (*Heishman*); *People v. Wiley* (1976) 18 Cal.3d 162, 174-176 (*Wiley*).) Nor is it required "where the alleged circumstantial evidence is incidental to, and corroborative of, direct evidence." (*People v. Malbrough* (1961) 55 Cal.2d 249, 251.)

### 3. Analysis

Although both sides agreed below that CALCRIM No. 225 (circumstantial evidence: intent or mental state) was the appropriate instruction, Quintana now contends that the trial court should have given CALCRIM No. 224 (circumstantial evidence: sufficiency of evidence) instead. We disagree.

To prove the possession of ammunition charge, the prosecution had to establish both that the ammunition was under Quintana's custody and control and that Quintana *knew* the ammunition was under his custody and control. (§ 30305, subd. (a)(1); CALCRIM No. 2591.) The evidence presented at trial supported the conclusion that

18

Quintana resided in the garage and thus had possession and control over the various items found there. With respect to Quintana's knowledge of the ammunition, and thus his intent to possess it, the evidence was more circumstantial. No one testified seeing Quintana with the ammunition or putting it in the candleholder, nor did Quintana admit that the ammunition belonged to him. There was another person in the garage with him when police executed the search warrant, and Hinojosa testified that other people visited the garage from time to time. Defense counsel argued this evidence raised a reasonable doubt as to whether Quintana knew the ammunition was present.

Since the knowledge elements of the possession of ammunition charge rested substantially or entirely on circumstantial evidence that was equally consistent with a reasonable conclusion of guilt or innocence, the trial court properly instructed the jury with CALCRIM No. 225. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1171; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49.) Because the other elements of the charge rested substantially or entirely on direct evidence, the court did not err in failing to instruct the jury with CALCRIM No. 224. (*Heishman*, *supra*, 45 Cal.3d at p. 167; *Wiley*, *supra*, 18 Cal.3d at pp. 174-176.)

We also reject Quintana's argument that the failure to give CALCRIM No. 224 violated his constitutional right to due process. A trial court does not commit error of constitutional dimension by failing to instruct on circumstantial evidence if it has properly instructed on reasonable doubt. As explained in *Rogers*, *supra*, 39 Cal.4th 826: "Insofar as the federal Constitution itself does not require courts to instruct on the evaluation of circumstantial evidence where, as here, the jury properly was instructed on reasonable doubt [citations], defendant's claim necessarily rests on the asserted arbitrary denial of a state-created liberty interest. [Citation.] We doubt the common law right to a circumstantial evidence instruction rises to the level of a liberty interest protected by the due process clause." (*Id.* at pp. 886-887; see also *People v. Smith* (2008) 168

19

Cal.App.4th 7, 18-19.) Here, the jury was properly instructed on reasonable doubt and the People's burden of proof, and the constitutional claim necessarily fails.

### F. Ineffective assistance of counsel

Quintana argues his counsel was ineffective in the following ways: (1) for failing to object to the inadmissible and prejudicial evidence that, among the items attached to his keyring, was a bullet fashioned into a charm; (2) for eliciting testimony that an informant had told police that there was "a lot of foot traffic" at the garage; and (3) for essentially inviting the court at sentencing to sanction Quintana for electing to go to trial rather than enter a plea bargain.

#### 1. Relevant legal principles

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-696.) 'When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of representation provided by counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' [citation], the contention must be rejected." ' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.)

Quintana bears a burden that is difficult to carry on direct appeal. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Our review of a claim of ineffective assistance of counsel is highly deferential; we must make every effort to avoid the distorting effects of hindsight and to evaluate the challenged conduct from counsel's perspective at the time.

20

(*In re Jones* (1996) 13 Cal.4th 552, 561; *Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)  A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance.  (*Strickland v. Washington*, *supra*, at p. 689; *People v. Hart* (1999) 20 Cal.4th 546.)  As to the failure to object in particular, "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel."  (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

As to the prejudice prong, "[t]he United States Supreme Court [has] explained that this second prong of the *Strickland* test is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' "  (*In re Harris* (1993) 5 Cal.4th 813, 833.)  A defendant must prove prejudice that is a " 'demonstrable reality,' not simply speculation."  (*People v. Williams* (1988) 44 Cal.3d 883, 937; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

### 2. *Failure to object to evidence of bullet charm on keyring*

During trial, a police officer described the items on the keyring found hanging inside the garage.  In addition to keys to the garage and Quintana's truck, the officer stated there was a bullet that had been fashioned into a "charm of some sort."  Defense counsel did not object.

Quintana now asserts this evidence was inadmissible character evidence tending to show his disposition to possess ammunition.  Though Quintana argues there was no satisfactory tactical reason for not objecting to the testimony, it seems reasonable to conclude that raising an objection may have actually underscored the importance of the testimony to the jury.  Regardless, we fail to see how the failure to object to this evidence rendered the trial fundamentally unfair.  The bullet charm on Quintana's keyring was not the focus of the evidence nor was it the focus of the prosecutor's argument to the jury.

21

### 3. Eliciting testimony of another informant

Defense counsel successfully moved in limine for an order precluding reference to the confidential informant who gave the information leading to the search warrant. During his cross-examination of Officer Delfin, who was not present during the search, defense counsel indicated that the officer "received no information that there was a lot of foot traffic that was coming to and fro at this address, 157 Manana Lane?" Delfin responded, "Actually, I have, but--. . .--from--a different--a completely different informant around the same time." The trial court interrupted and declared a recess, during which time it questioned Delfin about the confidential informant he referenced. Delfin confirmed that the informant who told him about the foot traffic at the garage was not the same one who provided the information leading to the search warrant. The prosecutor and defense counsel both agreed not to question Delfin any further about this second informant.

Quintana argues defense counsel had no good reason to ask Officer Delfin about foot traffic at the address since no one had testified there was any such traffic. This is not correct however, since Hinojosa testified that different women would come to visit the garage, and he often heard visitors in the garage with Quintana or knocking on the garage door for him to come out.

Regardless, even if this amounted to ineffective assistance of counsel, Quintana cannot show prejudice. The jury would still have Hinojosa's testimony about all of Quintana's visitors, and the reference to the second informant was brief and not pursued by the prosecutor or defense counsel in any way. The other evidence that Quintana possessed methamphetamine for sale, such as the text messages, packaging materials, bindles of methamphetamine and scales, was more than sufficient to support his conviction on that charge even without the passing reference to another informant saying there was foot traffic at the garage.

22

####  4.     *Comments at sentencing hearing*

The probation report recommended three years of probation, with a year in county jail, noting that Quintana had a fairly lengthy criminal history including drug offenses in 1992, 1993 and 2007.  The prosecutor urged the court to reject that recommendation and instead impose a two-year sentence in prison, pointing out that before trial, Quintana had rejected an offer of one year in jail.  The prosecutor also noted that Quintana had demonstrated a "continued lack of acceptance of responsibility for the current offense and minimiz[ed his] prior offenses."

Defense counsel asked that the court adopt the probation department's recommendation, emphasizing how Quintana had been taking part in all the drug programs available to him while in custody, as well as attending bible school.  Counsel said, "He did go to trial, and he did lose, and so I understand there needs to be some sanction for that, but I do recall . . . that at the time of the guilty verdict, we didn't think that this was a state prison case, and that's why we sent it out to probation, and now probation is confirming that it is a year."

The trial court rejected the recommendation of probation, and elected to sentence Quintana to a county jail term of two years on count 1 and a consecutive 30 day term on count 2, with 16 months in jail followed by eight months of community release.  The court said it was impressed with Quintana's efforts to improve himself while in custody, but noted he was convicted of a serious crime, i.e., selling drugs.  However, the trial court opted for a jail sentence because of Quintana's prior record, with increasingly severe convictions, and his prior poor performance on probation.

While defense counsel's statement was, at a minimum, inelegant and ill-advised, it does not amount to ineffective assistance of counsel.  The trial court explained the basis for its sentencing decision at some length and made no mention that Quintana's decision to reject a plea bargain and instead risk a trial was ever a factor.  On this record, we fail to

23

see any reasonable probability that Quintana would have obtained a more favorable result even if defense counsel had not made this particular statement to the court.

G. *Cumulative error*

Because we have found no basis for any of Quintana's claims of error, the claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin*, *supra*, 18 Cal.4th at p. 335.)

H. *Review of sealed transcript of hearing on motion to disclose identity of confidential informant*

As requested, we have reviewed the sealed transcript of the in camera hearing to determine whether the trial court erred in denying the motion to disclose the identity of the confidential informant. We find the court did not abuse its discretion in denying the motion as there is no "reasonable possibility that [the confidential informant] could give evidence on the issue of guilt that might exonerate the defendant." (*People v. Lawley* (2002) 27 Cal.4th 102, 159.)

I. *AIDS education fine and credits*

Quintana argues the $190 AIDS education fine pursuant to section 1463.23 must be stricken because it was not orally imposed by the court at the sentencing hearing and the court's oral imposition of sentence controls.

In addition, the court awarded Quintana 138 days of custody credits and 138 days of conduct credits, for a total of 276 days of credit. However, the sentencing order notes credit of only 138 days.

The People concede both issues, and we agree that the concessions are appropriate.

As to the education fine, when there is a discrepancy, the record of the court's oral pronouncement of judgment ordinarily controls over the clerk's minute order. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Mesa* (1975) 14 Cal.3d 466,

24

471.)  The trial court made no mention of such a fine at the sentencing hearing and because it is permissive rather than mandatory, it should be stricken.

## III.  DISPOSITION

The trial court is directed to modify the sentencing order to strike the $190 AIDS education fine (Pen. Code, § 1202.4, subd. (b)).  The trial court is further directed to modify the sentencing order to award 138 days of conduct credit for total credits of 276 days.  As modified, the judgment is affirmed.

_____

Premo, J.

WE CONCUR:


_____

Rushing, P.J.


_____

Márquez, J.